The **COLD METAL PROCESS COMPANY** and The **Union National Bank of Youngstown, Ohio, Trustee, Appellants,**

v.

**REPUBLIC STEEL CORPORATION, Appellee.**

**REPUBLIC STEEL CORPORATION, Appellant,**

v.

The **COLD METAL PROCESS COMPANY** and The **Union National Bank of Youngstown, Ohio, Trustee, Appellees.**

Nos. 12363, 12364.

United States Court of Appeals
Sixth Circuit.

April 10, 1956.

As Modified on Denial of Rehearing
June 8, 1956.

William H. Webb, Pittsburgh, Pa. (William H. Webb, Howard F. Burns, Pittsburgh, Pa., Clarence B. Zewadski, Detroit, Mich., Morton Burden, Jr., Joseph R. Robinson, Jr., Webb, Mackey & Burden, Pittsburgh, Pa., Whittemore, Hulbert & Belknap, Detroit, Mich., Baker, Hostetler & Patterson, Cleveland, Ohio, on the brief), for Cold Metal Process Co. and another.

John N. Cooper, New York City (T. F. Patton, Cleveland, Ohio, Drury W. Cooper, John N. Cooper, Robert E. Isner, Cooper, Dunham, Keith & Dearborn, New York City, on the brief), for Republic Steel Corp.

Before SIMONS, Chief Judge, and ALLEN and McALLISTER, Circuit Judges.

ALLEN, Circuit Judge.

These appeals arise out of an action for injunction and accounting for infringement of Patents Nos. 1,744,016 and 1,779,195 for improvements in rolling mills, referred to hereinafter as Patents '016 and '195, issued to Abram P. Steckel. The patents relate to mills and methods of rolling steel in thin strip form. The action was brought by The Cold Metal Process Company, hereinafter called "Cold Metal," an Ohio corporation, assignee of the patents, against Republic Steel Corporation, hereinafter called "Republic," a New Jersey corporation doing business in Ohio. The principal defenses were invalidity of both patents, noninfringement, and immunity from infringement under a certain license hereinafter described. The patents were assigned by Cold Metal to Union National Bank of Youngstown, Ohio, as Trustee, which joined the action as party plaintiff. Both patents expired prior to the trial of this suit.

The two patents grew out of an application filed June 30, 1923, by Abram P. Steckel. At the direction of the Patent Office a division was made. Patent '016 issued January 14, 1930, on the original application; Patent '195 issued October 21, 1930, on the divisional application filed December 9, 1929.

In the District Court the case was referred to a Special Master, who heard the evidence and in a detailed report found that all of the claims of '195 were invalid for lack of novelty and invention but that, if the apparatus claims were valid, Republic infringed them by operation of eight of the accused mills. The Master found Claim 5 of '016 lacked novelty and patentable invention. All other claims of '016 in suit he considered valid.

The District Court found the method claims of Patent '195 invalid, but held that the apparatus claims presented patentable novelty and that these claims were infringed by six of Republic's mills. As to Patent '016, the District Court found that the claims in suit, with the exception of Claim 5, were valid and that five of Republic's mills infringed certain of these claims. Both the Master and the District Court concluded that as to all of the accused mills Republic was immune from any claim of infringement of either patent by virtue of a license agreement of June 20, 1927, between Cold Metal and United, from which Republic claims to have purchased all of the accused mills. The complaint was dismissed without costs to either party.

As to many points at issue the findings of fact of the Master and the District Court were concurrent. This court is bound by these concurrent findings unless they are clearly erroneous. The Master heard the witnesses for some four months. The District Court personally inspected the accused mills and the mills claimed to anticipate. The concurrent findings of fact are amply sustained by the record. The principal questions as to findings not concurrent concern the validity of the conclusions drawn from the facts. While every point urged has been carefully consid-

ered, we deem it unnecessary to encumber the books with a restatement of all the details clearly shown below and for amplification of the discussion upon the less important points we refer to the carefully drawn opinion of the District Court, 123 F.Supp. 525.

In general the facts are not in controversy. Cold Metal concedes that every element in the structure of the patented mills is old, that the structural proportions described are old, and that, prior to issuance of '016, tension had been used in strip rolling for winding up the strip and guiding it through the rolls.

The elaborate findings of fact of the Master and District Court in the main agree as to the physical characteristics of the patented mills, their methods of operation, the problems in the steel industry sought to be solved, the failure of the prior art mills to solve these problems, and the achievements of the Steckel teaching. Even as to Patent '195, which the Master found invalid in its entirety for lack of invention, the evidential findings of the Master in general are not contradictory to the detailed findings of the District Court.

The patents in suit relate to mills and processes for the reduction of blooms or slabs of steel into thin sheet-like metal in strip form or into commercial tin plate. Steckel uses a 4-high mill, which consists of four rolls placed one above the other. In the 4-high mill the middle rolls are the "working rolls" and top and bottom rolls are the "backing rolls." The purpose of the backing rolls is to stiffen the working rolls against the deformation caused by reduction of the material rolled. In the 4-high mill the material is passed between the two work rolls, which are usually smaller in diameter than the backing rolls. Prior to Steckel the 4-high mills were generally employed only for rolling thick and heavy products, and the 2-high mills, which consist of two rolls positioned one above the other, were the most common type in use for hot and cold rolling of steel plates, sheets, and strips.

With the advent of the automobile industry steel sheets became increasingly useful and important. They are used in such equipment as automobile bodies, fenders, hoods, tops, hub caps, and also in refrigerators, metal furniture, washing machines, door and window frames, and various metal stampings. Sheets run in gauge from .1379 inches to .0123 inches and require a high surface finish. Tin plate is usually thinner than sheets, is coated with tin, and is generally rolled to between .010 inches and .0079 inches in thickness. As the reduction in thickness progresses, the difficulty of rolling steel into thin sheets or strips is intensified. In ratio of width to thickness 400 to 1 is accepted as the dividing line between low-ratio and high-ratio material. Tin plate is high-ratio material.

The Master found and the record shows that the rolling of thin material in strip form is a specialized art, involving problems not presented in rolling plates, bars, billets, and the heavier steel products. Extremely high standards of accuracy are required in rolling strip. If the operation is off gauge a part may be cracked. The Master found in effect, and it is undisputed, that in rolling strip, variations of thickness measurable only in ten-thousandths of an inch will cause irregularities which render the material unfit for commerce, while no such requirements as to accuracy of gauge exist for the reduction of steel billets.

Long before the patents in suit were issued there had been a demand, completely unsolved, for high-ratio material of high quality and low price. The District Court called the demand for less expensive thin metal strip "insistent" and stated that the industry appeared to be helpless over a period of many years to overcome the "technological block" in the cold rolling of thin strip. In the three methods of strip and tin plate rolling used before Steckel, hot pack rolling, hot strip rolling, and cold strip rolling, as found by the District Court, the industry had never been able to secure speed of operation, accuracy of gauge, a minimum

of scrap, and the elimination of expensive and time-consuming annealing. In the hot pack rolling, for instance, a manual process which Judge McVicar, in Cold Metal Process Co. v. United Engineering & Foundry Co., D.C., 3 F.Supp. 120, 122, called "a man-killing job", 240 feet per minute was the maximum speed. In the hot strip rolling heating of the roll caused the strip to buckle and riffle, the lengths produced were short, and the width was around 24 to 28 inches. The ratio of width to thickness was approximately 200 to 1. In cold strip rolling while a better product was secured with smoother finish and greater length than in hot strip rolling, and widths up to 28 inches were possible, it was usually necessary from time to time to suspend the operation and anneal the steel to allow further cold rolling. Otherwise, the reduction could not continue. From one to seven annealings were usually required, and the process often took four weeks. As the former General Works Manager of a leading steel company testified, in reducing a low carbon strip 12 inches wide and .109 inches thick to a final thickness of .015 inches, the practice would be as follows:

"We would reduce from .109 to .070 and anneal. From .070 to .048 and anneal. From .048 to .030 and anneal. .030 to .020 and anneal. And from .020 to .015; making a a total of four anneals."

100 to 165 feet per minute was the maximum speed for the cold rolling of thin sheets. For low-ratio material the maximum speeds were around 250 feet per minute. The important problems, long insuperable in the art, were how to roll at high speed without causing buckles and riffles and how to eliminate interruptions for annealing in cold rolling. The Master and the District Court each found that the Steckel mills eliminated these problems.

This record is replete with testimony supporting these findings. A few examples will suffice. It was shown that a sample of 1.27 carbon steel, which has a ratio of width to thickness of 4150 to 1, was rolled in regular production on the Steckel mill. The sample was about half the thickness of a piece of newspaper, a fourth of the thickness of a razor blade, and it could not have been rolled on the old 2-high mill. The early 2-piece fenders and hoods which were fabricated with hinges in the middle, were superseded by 1-piece tops and fenders. Under the 2-high mill operation the cost of rolling stainless steel 12" wide, .95" thick down to .18" thick, including 6 anneals and pickling, was $188.22; the 4-high (Steckel) cost was $42.60 with no anneals; the 4-high (Steckel) cost with one intermediate anneal for cleaning the surface was $66.55. As a result the Steckel mills greatly increased the opportunities for the use of stainless steel. The reduction in requirements for manpower was equally marked. For instance, it was testified that "We used from 50 to 65 per cent of the labor on 4-highs that we used on 2-highs." And in the cold stamping department of a leading plant the labor requirements were "almost cut in half" by use of the Steckel mills.

■ The method claims of '195 were held invalid in concurrent conclusions of the Master and of the District Court because of the failure of the patentee particularly to point out and distinctly claim an identifiable invention as required by 35 U.S.C. § 33 (1940 ed.). The claims involved are 1, 2, 5, 9, and 10. Claim 1 is typical. It reads as follows.

"In the method of rolling thin sheet or strip material in a mill having working rolls, and backing rolls, of larger diameter, for the working rolls, the steps consisting in limiting the rise in temperature of the backing roll necks to such a point that variations in the contour of the backing rolls are controlled within such limits as to substantially prevent buckling or wrinkling of the thin material passed between the working rolls."

As correctly held below, this claim and the other method claims are directed to all steps which may control rises in temperature of the backing roll necks

and the backing rolls. It covers processes practiced in the prior art, employing flood cooling and specialized lubricants and lubricating systems as well as similar processes that might be devised in the future. The claims overclaim the invention and are rightly held invalid. Graver Tank & Mfg. Co., Inc., v. Linde Air Products Co., 336 U.S. 271, 276, 277, 69 S.Ct. 535, 93 L.Ed. 672.

■ As to the apparatus claims of '195 considered invalid by the Master but held valid by the District Court, Republic contends that under Rule 53(e) (2) of the Federal Rules of Civil Procedure 28 U.S.C.A., the District Court was compelled to accept the Master's findings unless clearly erroneous and to hold Patent '195 invalid in its entirety. The court in its order of reference specified that the report of the Master and his proposed findings and conclusions should be advisory only. The advice of the Master "is not lightly to be rejected." Atherton v. Anderson, 6 Cir., 86 F.2d 518, 522. However, we have also held, construing an order of reference similar to the one here involved, that the Circuit Court of Appeals, while accepting facts conclusively found by the Master as correct, remains free to derive ultimate inferences and conclusions which in its opinion the findings reasonably induce. Atherton v. Anderson, 6 Cir., 99 F.2d 883, 890; Kycoga Land Co., Inc., v. Kentucky River Coal Corp., 6 Cir., 110 F.2d 894, 896; Socony-Vacuum Oil Co., Inc., v. Oil City Refiners, Inc., 6 Cir., 136 F.2d 470, 473, certiorari denied 320 U.S. 798, 64 S.Ct. 369, 88 L.Ed. 482. Moreover, Rule 52 of the Rules of Federal Procedure provides that in all actions tried upon the facts without a jury, or with an advisory jury, the court shall find the facts specially and state separately its conclusions of law thereon and that such findings of fact "shall not be set aside unless clearly erroneous * * *." Here the evidential findings as to the problems presented in rolling thin strip, the success or non-success of the prior art in solving them, the development of the Steckel mills and processes, and the particular construction of the Steckel mills are the subject in the main of concurrent findings by the District Court and the Master. Many of the material basic facts are conceded. The conclusion of the Master as to the validity of '195 is not to any great degree based upon the credibility of the witnesses. Cf. Atherton v. Anderson, supra. It is primarily based upon the Master's examination of the file wrappers of patents and practices of the prior art and of adjudications in previous Cold Metal patent controversies. The District Court was not compelled to accept the ultimate inferences of the Master and his conclusions as to invalidity of the 12 apparatus claims of '195. We agree with the District Court that the Master's proposed conclusion that these claims of '195 are invalid is incorrect because it failed rightly to apply the patent law to the facts of record.

All of the apparatus claims of Patent '195 are involved, namely, Claims 3, 4, 6, 7, 8, and 11 through 17. Claims 4 and 15 are typical and are printed in the margin.[1]

The problem as stated in the specification was that of securing a mill in

1. "4. A mill for rolling material of substantially uniform thickness, comprising working rolls provided with backing rolls of larger diameter, the backing rolls having necks of sufficient size to withstand the rolling pressure, anti-friction bearings for said backing roll necks, the diameter of the backing roll body relative to the diameter of the working roll being such as to permit of using anti-friction bearings of sufficient size to withstand the rolling pressure, said anti-friction bearings being of a character to withstand operation at speeds which are high relative to those ordinarily employed, a working roll having a neck extending between the anti-friction bearings of the backing rolls, and means for supplying rolling power through the working roll neck.

* * * * *

"15. A mill for rolling sheet or strip like material of substantially uniform thickness comprising a working roll of substantially uniform diameter in the body portion provided with a backing roll of larger diameter and anti-friction mounting for said backing roll, the backing roll being of sufficient diameter to permit of using an anti-friction mounting

which steel could be cold rolled into sheet or strip at speeds many times in excess of 150 to 200 feet a minute and in which the variations in the contour of the backing rolls of a 4-high mill could be controlled within such limits as substantially to prevent buckling and wrinkling of the thin metal passed between the working rolls, and also of producing a product practically free from heavy center or "crown." Steckel taught the use of a 4-high mill consisting of (1) working rolls of substantially uniform diameter in the body portion, (2) backing rolls of larger diameter, preferably twice the diameter of the working rolls, and (3) anti-friction mounting or bearings for the backing rolls. The diameters of the backing rolls are sufficiently large to provide for the use of roller bearings which will withstand the heavy rolling pressures encountered and "last indefinitely," operating at speeds "on the order of multiples of those commonly employed" for the rolling of such metal. The pertinent parts of the specification are printed in the margin.[2]

of a character to withstand the rolling pressures encountered and to operate for extended periods of time at speeds which are on the order of multiples of speeds commonly employed in the rolling of such material."

'195

2. "I provide working rolls having backing rolls of larger diameter and anti-friction mounting for said backing rolls of a character adapted to withstand the rolling pressures encountered and the high speeds which are employed. In a preferred form of the invention the backing rolls are provided with necks which carry the anti-friction bearings, these necks being of sufficient size to withstand the rolling pressure, and the diameter of the backing roll body relative to the diameter of the working roll being of exaggerated size so as to permit of using anti-friction bearings of sufficient size for the conditions encountered. It is important that the bearings be of adequate size and of proper character and in the form of the invention herein particularly described, roller bearings employing spaced-apart rollers are used.

"Prior to my invention it was generally considered impossible to cold roll at speeds in excess of 150 to 200 feet per minute, whereas by the term 'high speed' I contemplate speeds several times this figure, or in the order of multiples of the speeds commonly employed. In hot rolling fairly high speeds have been employed in the manufacture of extremely narrow material. In such case the roll neck bearings have been subjected to only relatively light loads, and such speeds prior to my invention were not applicable to wider mills or to mills where there was marked pressure on the bearings. By my invention the limitations of speed on both hot and cold mills are removed.

"In order that the bearings shall be adequate to withstand the rolling pressure over extended periods of time, it is desirable that the backing roll necks be at least as large, and preferably larger, than the working roll bodies. The backing roll bodies are larger than the necks thereof in an amount sufficient to provide adequate space for the anti-friction bearings.

"Anti-friction bearings of the proper character will operate continuously with but little temperature rise. They therefore limit the frictional resistance of the backing rolls to rotation below a point where the active pass contour is adversely affected. Where the roller bearings are applied to the backing roll necks they eliminate the heating of such necks, which heat adversely affects the shape of the working roll body. Stated in another way, the anti-friction bearings on the necks are effective for limiting the rise in temperature of such necks to such a point that variations in the contour of the backing rolls are controlled within such limits as to substantially prevent buckling or wrinkling of the thin material passed between the working rolls.

\* \* \* \* \*

"A great advantage of the design is that the backing rolls can be given any desired diameter without affecting the power required to operate the mill. It is therefore possible to employ large backing rolls, thus permitting the use of adequate anti-friction bearings, whereas in two-high mills for rolling material of substantially uniform thickness there is not sufficient space to accommodate anti-friction bearings which will carry the load; this because in the rolls of a two-high mill the necks of the rolls would have to be so large in order to resist the separating force that there would be insufficient space between them for adequate roller bearings."

Every element in the Steckel disclosure including the proportions of the various parts was old in the art.

The District Court said the Steckel invention "revolutionized the manufacture of thin metal sheets or strips." It held that the combination

"results in the reduction of frictional drag on the backing rolls and permits the mills to be operated at speeds far in excess of those possible in the prior art mills, without experiencing the overheating of the backing rolls and the buckling and riffling of the metal strip, which was characteristic of the prior art mills when operated at such speeds.

\* \* \* \* \* \*

"Intermediate annealings were eliminated entirely for the low and high carbon steels and for some alloys and were materially reduced in the rolling of other alloys. Thus, orders may now be rolled in a day which required several weeks to complete on the old mills. There is evidence that as early as 1930 the Steckel mills made possible savings in cost of $19.46 per ton on low carbon steel and as much as $145.00 per ton on stainless steel. Metal sheets can be produced which are 30 to 40% thinner and many times wider than was previously possible and can be made in coils, hundreds of feet long; as compared with former maximum lengths of 8 to 13 feet."

Republic contends that the District Court was unduly influenced by the alleged advantages of Steckel's conception and by the idea that the increased use of the backed-up mill was in some degree contributed by Steckel. It urges in effect that the Steckel patents achieved no new results. But the finding, both of the Master and the District Court, is to the contrary. Various mills claimed to anticipate were inspected by the District Court. The finding of the District Court with reference to the accomplishment of the Steckel invention in the production of thin metal sheets or strips is amply sustained by the record.

■ Part of the argument of Republic on invalidity of '195 is addressed to the theory that the Steckel mills constituted an aggregation. It suffices to say that there is no evidence of substance supporting this contention. In the Steckel mills every element co-acts with every other element to produce a new and useful result. Here we deal with a true combination. The controlling question is whether this combination has a new method of operation, and whether the new and useful results were obtained in a manner which was or was not obvious to persons of ordinary skill in the art. American Chain & Cable Co., Inc., v. Rochester Ropes, Inc., 4 Cir., 199 F.2d 325.

The fact as held below that Steckel's conception was not obvious to persons of ordinary skill in the art is strongly sustained by the record of adoption by the industry. Although some $29,000,000 has been paid under the licenses of the Steckel invention, the evidence presents far more than commercial success. Licenses were granted to such concerns as National Steel, Allegheny Steel, Crucible Steel, American Brass Company. After the decision in Cold Metal Process Co. v. Carnegie-Illinois Steel Corporation, 3 Cir., 108 F.2d 322, United States Steel took a license. Several corporations renewed their licenses two or three times or took out a broader license. Suits against Bethlehem Steel Company, Youngstown Sheet & Tube Company, Wheeling Steel Company, American Rolling Mill Company, and Jones & Laughlin Steel Corporation were settled in 1945 and licenses were taken out by these outstanding concerns. During the lives of the patent approximately 85% of the steel industry accepted licenses from Cold Metal and paid royalties thereon.

Meanwhile the old 2-high mills were gradually being scrapped because of unsatisfactory results in the making of sheet metal and tinplate. For instance, the two Bray-type mills, set up in 1904 and 1906, respectively, at the Monongahela plant of the American Sheet & Tin Plate Co., were abandoned because of

unsatisfactory performance. These mills which practiced the hot pack rolling method included automatic matchers and doublers and eliminated substantially half of the hand labor. But the perfect heating demanded for satisfactory results was not secured. Under the Bray system the plates stuck together because of irregular contours, causing much scrap, and the two mills were abandoned. Donner v. American Sheet & Tin Plate Co., 3 Cir., 165 F. 199, 204.

Both the Master and the District Court found that the important mills claimed to anticipate did not have the capacity to perform the functions or accomplish the results of Steckel. The Master made specific findings to this effect with reference to the Bridgeport (Keating) mills, the Cluster and Williams mills of the Spencer Wire Company, and the Blake and Johnson 3-high mill, heavily relied on in this court. The Master found that the 2-high plain bearing mills of the prior art of Superior Steel Corporation, West Leechburg Steel Company, Trumbull Steel Company, and the Stanley Company did not embody Steckel's combination. The District Court discussed only the Blake and Johnson 3-high mill and the Bridgeport (Keating) mills, both of which it found not capable of the performance of Steckel. Individual parts of the pin type bearing of Keating had often to be replaced every day and each backing roll with its bearing had to be changed every week. The publication *Strip Sheets,* issued around 1928, which described the attempt to eliminate the technological bottleneck in this specialized branch of the steel art pointed out the great rewards awaiting the man who would solve the problems. But it also pointed out that the 2-high hot rolling process was still of a conventional character. To say that there is no invention in disclosures which have filled such a long-existing demand in the steel industry, to which the greatest companies in the country have paid tribute by settling litigation and taking out licenses is to deny the actualities of the patent law. As stated by Judge Learned Hand in Chadeloid Chemical Co. v. Wilson Remover Co., D.C., 220 F. 681, 682:

"The value of an invention gets its safest test from what those think of it who are looking impartially for the best thing they can get for their purpose; when they have so decisively declared against the old forms and for the new, no trials on mice or selected panels account for anything whatever."

■ The best of the art relied on here was before the Patent Office and this fact strengthens the presumption of validity. Modern Products Supply Co. v. Drachenberg, 6 Cir., 152 F.2d 203, 205, certiorari denied 327 U.S. 806, 66 S.Ct. 964, 90 L.Ed. 1030.

■ Moreover, the District Court's conclusion as to the validity of the apparatus claims is strengthened by the fact that the patents have been upheld in previous adjudications. Cold Metal Process Co. v. United Engineering & Foundry Co., supra, 3 Cir., 68 F.2d 564; certiorari denied, 291 U.S. 675, 54 S.Ct. 530, 78 L.Ed. 1064. Cold Metal Process Co. v. American Sheet & Tin Plate Co., D.C., 22 F.Supp. 75, held '195 invalid, but was reversed on that point by Cold Metal Process Co. v. Carnegie-Illinois Steel Corp., supra. The prior decisions holding these patents valid should be followed unless the court is convinced of "a very palpable error in law or fact," Justice Lurton speaking for the court in Penfield v. C. & A. Potts & Co., 6 Cir., 126 F. 475, 478; Cincinnati Butchers' Supply Co. v. Walker Bin Co., 6 Cir., 230 F. 453, 454. The fact that the patents have revolutionized the art to which they relate requires that they be given liberal construction. Westinghouse Electric & Manufacturing Co. v. Quackenbush, 6 Cir., 53 F.2d 632, 634; Atlantic Works v. Brady, 107 U.S. 192, 200, 2 S.Ct. 225, 27 L.Ed. 438. The long-standing want and insistent demand satisfied by the patentee demonstrate the existence of invention. Goodyear Tire & Rubber Co., Inc., v. Ray-O-Vac Co., 321 U.S. 275, 279, 64 S.Ct. 593, 88 L.Ed. 721; Watson v. Heil, 4 Cir., 192 F.2d 982, 985.

The fact that there was a "technological block" which those skilled in the art had not previously eliminated is cogent evidence of invention. Goodwin v. Borg-Warner Corporation, 6 Cir., 157 F.2d 267, 273; Trabon Engineering Corporation v. Dirkes, 6 Cir., 136 F.2d 24; Gairing Tool Co. v. Eclipse Interchangeable Counterbore Co., 6 Cir., 48 F.2d 73, 75. We adhere to the declaration of this court "that long recognition of an existing problem in any art, and the advantages to accrue to an industry from its solution, have been considered as highly persuasive of invention when success is finally achieved * * *." Trabon Engineering Corporation v. Dirkes, supra, 136 F.2d 27.

Republic lays particular stress upon its contention that there was no invention in "applying roller bearings to the backing rolls of the old backed up mills." It supports this argument by the Master's finding that none of the elements of the '195 combination performed any additional or different function in the combination from what it was known to perform out of it. The District Court did not adopt this finding but in effect disapproved it in deciding that '195 embodied a true combination presenting patentable invention. Republic renews this contention here, claiming that the Master's specific determination on this point, since it was not expressly disapproved by the District Court, requires as a matter of law a conclusion of invalidity. It cites Lincoln Engineering Co. v. Stewart-Warner Corp., 303 U.S. 545, 58 S.Ct. 662, 82 L.Ed. 1008, in which the Supreme Court held that an aggregation of old parts which in the aggregation perform or produce no new or different function or operation from that theretofore produced, is not patentable and points out that in Great Atlantic & Pacific Tea Co. v. Supermarket Equipment Corp., 340 U.S. 147, 71 S.Ct. 127, 95 L. Ed. 162, the Supreme Court holding a combination of old elements unpatentable stressed the fact that there was no finding of new function.

It cannot seriously be contended that the Steckel mill is an aggregation, nor that its results are "aggregative." It is the mill which performs the rolling process and every element in the mill co-acts to carry out this process. The motors activate the rollers, the work rolls reduce the material. Simultaneously the backing rolls stiffen and give strength to the working rolls. The roller bearings do not operate independently. As the roller bearings co-act with the other elements of the mill the reduction of friction and of heat and wear are being achieved simultaneously.

This record shows that roller bearings had not been used before on 4-high mills. The use of roller bearings of such strength as to cope with the extremely high pressures involved in these operations, speeded up to multiples of the former attainable speeds, was not made possible until Steckel by his new structure afforded sufficient space in the combination for roller bearings of increased size and strength.

Republic's contention carried to its logical conclusion is that for a combination of old elements in a machine to be patentable, these elements must be transformed into mechanical processes or mechanisms performing different mechanical functions from those they formerly performed. We think this is not sound. A roller bearing will always be a roller bearing. A mechanism used in a combination is not thereby transformed into a different mechanism. However, when it is installed in a new environment, it performs a new function if the operation is new and the result is new. Here the roller bearing was installed in a new environment where it had room to function, where its size was adequate to the greatly increased loads, and the results revolutionized the industry. In order to secure a true and patentable combination of old elements, the elements must co-act to produce the result achieved, the result must be new and useful, and the method of operation must be new. Great Lakes Equipment Co. v. Fluid Systems, Inc., 6 Cir., 217 F.

2d 613, 617. If the method of operation is new and the result is new, the old elements perform a new function in their new environment. These factors are present in '195 in high degree.

A similar contention was made in the Cold Metal case tried in the District Court of New Jersey, Cold Metal Process Co. v. American Sheet & Tin Plate Co., D.C., 22 F.Supp. 75. It was urged there that the roller bearing was the gist of the invention and that its use involved no more than the skill incident to the art. The District Court there held that Patent '195 failed to disclose invention, although it sustained the validity of Patent '016. The Court of Appeals for the Third Circuit, Cold Metal Process Company v. Carnegie-Illinois Steel Corporation, supra [108 F.2d 335], reversed this decision, saying:

"* * * we are of opinion that Steckel's disclosure involved invention of a high order. In the first place it was utterly at variance with the views of the then art and was regarded as foolish. However, on its being put in practice, it attracted the attention of steel men both here and abroad, and led to their coming from this Country and Europe and for days studying its workings. It was adopted by steel workers here and abroad and is now being used. Its worth and its novel, useful and inventive character have led to the taking of licenses by numerous great companies and to negotiation for licenses by a larger number of the other large companies. It has in volume of product, in speed of production, in lessened scrap waste, lowering cost of production, in eliminating annealing, in lessening of gauge, in cost of labor, fuel, time of production and freeing men from working in torrid heat and 'mankilling' work, effected a revolution in cold rolling steel production.

* * * * * *

"The court below in holding '195 invalid, regarded the use of roller bearings as all important * * *.

The court was under the impression that all of real substance that Steckel did was to take the four stand mill, then in very limited use on the pack rolls, and put roller bearings in such mills. With due respect to the trial judge, we are of opinion this view did not sense the situation confronting the steel industry. We have seen that there was a great and growing demand for finer gauges of steel and for steel of a certain finish. Ball bearings had been in use for twenty years, but no one had shown how they could be used in cold rolling. Their reduction of friction was well known and evidently utilized in many arts. Manufacturers of them advertised their merits and suggested their use in rolling mills and indeed their ability to build a mill using them. But no one, either the advertiser or the steel art, acted on such suggestion. * * * No successful high speed cold rolling mill was built and the art still went on using the old 'pack' system and the relatively slow speed four-stand mills."

The court also pointed out the following consideration which has bearing here:

"As we have seen, the court below held the pull or tension patent '016 considered as a unit was valid. But that overlooks the fact that such pull or tension device was per se useless unless it was coupled with the four-high mill of the '195 patent."

While this opinion was withdrawn because of settlement of the controversy, the reasoning of the court is still persuasive. If the expert judgment of the greater part of the steel industry has weight the Steckel mill embodied patentable invention. The fact that by 1940 very many 2-high mills had been scrapped by concerns which recently had installed Steckel mills is cogent evidence along this line.

We conclude that the District Court was correct in holding that the ap-

paratus claims of '195 disclosed subject matter not obvious to a person having ordinary skill in the art, a new method of operation, and that patentable invention exists.

■ Patent '195 was attacked, as was '016, on the ground that the claims are invalid because of failure to comply with R.S. § 4888, 35 U.S.C. § 33. Republic asserts that the claims contain indefinite and functional language, for instance, describing the roll necks and bearings as being "of sufficient size" and "of a character" to withstand the pressures and high speeds to be encountered. The invention, Republic urges, is not described with the particularity required by the statute. Both the Master and the District Court concluded that, considering the claims as a whole, the invention was adequately defined so that one ordinarily skilled in the art from the specifications and the claims could erect a working model. This was a finding of fact which properly took into account the circumstance that the size and character of the roll necks and bearings vary with such conditions as the size of the mill, the nature of the material rolled, the speeds and pressures employed. The machine constructed on the basis of these patents was workable. The District Court correctly overruled the objection based upon noncompliance with the statute.

■ Republic also attacks a disclaimer filed by Cold Metal on September 23, 1932, which eliminated from the scope of apparatus claims 6, 11, 12, 14 and 16 of '195 the following phrase: "any mill having backing roll bearings of a character to limit the mill speeds to those employed prior to my invention for rolling such material." It disclaimed from the five method claims 1, 2, 5, 9 and 10, the process of "limiting the rise in temperature of the backing roll necks by limiting the mill speeds to those employed prior to my invention for rolling such material." Republic urges that this disclaimer was not made "through inadvertence, accident, or mistake." 35 U.S.C. § 65. It contends that this disclaimer introduced a new element into the scope of the claims and that the claims were intentionally made broad and then disclaimed after unreasonable neglect and delay in violation of 35 U.S. C. § 71. Unreasonable delay in making a disclaimer invalidates the entire patent. Marconi Wireless Telegraph Co. of America v. United States, 320 U.S. 1, 58, 63 S.Ct. 1393, 87 L.Ed. 1731. The contention that the disclaimer extended the claims was considered in E. W. Bliss Co. v. Cold Metal Process Co., D.C., 47 F. Supp. 897, 899. The court ruled that the disclaimer merely eliminated from the method claims "mill speeds" and from the apparatus claims "bearings of a character to limit the mill speeds", thus not altering the scope of the claim but merely changing the form of a claim which is too broad. Cf. Hailes v. Albany Stove Co., 123 U.S. 582, 587, 8 S.Ct. 262, 31 L.Ed. 284. The District Court herein made a similar disposition of this question and its conclusion is affirmed.

Moreover, the District Court specifically found that inadvertence existed and that there was no unreasonable neglect and delay in disclaiming. As found by the District Court the fact that the clauses eliminated by the disclaimer would limit the speed to those of the prior art, in an invention claimed to be operated at "multiples of the speed commonly employed," was clear evidence of inadvertence. Since the divisional application was filed December 9, 1929, the patent issued October 21, 1930, and the disclaimer was filed September 23, 1932, the record does not support the contention of unreasonable delay.

■ Finally, it is argued that Steckel's original application of June 30, 1923, does not form an adequate basis for the support of '195 claims filed in the divisional application of May 23, 1928, and that by May 23, 1928, the mills and processes covered by the disclosure of '195 had been in public use more than two years. If so, the claims are invalidated. Muncie Gear Works, Inc., v. Outboard, Marine & Mfg. Co., 315 U.S. 759, 62 S.Ct. 865, 86 L.Ed. 1171. Upon this

point the District Court found that the combination disclosed by the 1923 application consists of essentially the same elements as those in the apparatus claims of '195, namely, relatively small work rolls, larger backing rolls, and roller bearings on the necks of the backing rolls. The 1923 application thus supports claims covering the identical mills of '195. The District Court also found that the operation of the United mill at Rome, N. Y., was experimental and not widespread enough to constitute a public use. These are findings of fact not clearly erroneous and binding here.

 As to infringement of '195, the recommended findings of the Master and of the District Court are in many points concurrent. They demonstrate in detail that a number of the accused mills perform the same functions in substantially the same way and achieve substantially the same results as the Steckel mills. The burden of proving that these concurrent findings are clearly erroneous is heavy and was not sustained.

The Master found that if the apparatus claims of '195 were valid they were infringed by eight of the accused mills. The District Court found that the apparatus claims were infringed by six mills. As to the six mills these are concurrent findings of fact which we accept and follow.

 As to defendant's 98-inch Hot Mill, the No. 1 Tandem Mill, and the 54-inch Tandem Mill, which carry Morgoil bearings, the District Court found that no infringement existed. The Morgoil bearing is a sliding bearing cooled by a lubricant and sealed so as to exclude dirt, water, and other foreign matter. Oil is inserted under pressure and a film of oil is maintained between the back of the sleeve and the bushing, upon which film the roll neck and the sleeve ride. The structure of the Morgoil bearing is totally different from that of the roller bearing in which the load is carried on rolling elements or parts. While it is conceded that the Morgoil bearings perform all the functions of caged roller bearings, the District Court found them so different

in structure that the mills employing them do not infringe. It also pointed out that Morgoil bearings were not installed on rolling mills until after the Steckel patents were issued.

As to the last-mentioned point the Supreme Court in several cases has held that this circumstance is immaterial. Cf. Morley Sewing Machine Co. v. Lancaster, 129 U.S. 263, 9 S.Ct. 299, 32 L.Ed. 715, in which the infringing machine was made under a patent issued a year and a half after the patent held to be infringed. See also Cochrane v. Deener, 94 U.S. 780, 24 L.Ed. 139; Machine Co. v. Murphy, 97 U.S. 120, 24 L.Ed. 935.

On this point, however, these old decisions have been overruled in effect in Halliburton Oil Well Cementing Co. v. Walker, 329 U.S. 1, 67 S.Ct. 6, 91 L.Ed. 3. The Supreme Court there condemned the claim of Walker "that his patent bars anyone from using in an oil well any device heretofore or hereafter invented which combined with the Lehr and Wyatt machine performs the function of clearly and distinctly catching and recording echoes from tubing joints with regularity." It declared: "Yet if Walker's blanket claims be valid, no device to clarify echo waves, now known or hereafter invented, whether the device be an actual equivalent of Walker's ingredient or not, could be used in a combination such as this, during the life of Walker's patent," and specifically ruled against Walker's contention. Halliburton Oil Well Cementing Co. v. Walker, supra, 329 U.S. 13, 67 S.Ct. 12.

As to the structural difference, claims 7 and 14 of '195 specifically require roller bearings and hence are not infringed by Morgoil. To construe the apparatus claims which call for "anti-friction bearings" (claims 3, 4, 6, 8, 11, 12, 13, and 16) or "anti-friction mountings" (claims 15 and 17) as including such a different type of means for reducing the coefficient of friction as a bearing which achieves its result through lubrication does violence to the specifications. It is unnecessary to review in detail the discussion of the meaning of "anti-friction mounting"

and "anti-friction bearing" in deciding this relatively minor point. The fact remains that Morgoil is so completely different in structure and operation that it cannot be said to secure the same result as the roller bearing in substantially the same way. Hence it is not an equivalent of the roller bearing. The judgment of the District Court upon this feature of the case was correct.

With reference to the invalidity of Patent '016 the recommendations of the Master and the findings and conclusions of the District Court are concurrent. They each considered claim 5 invalid. This claim did not disclose the Steckel mill combination and was held to be anticipated by the prior art. All other claims in suit were sustained.

Patent '016, like Patent '195, discloses the use of the 4-high mill with two working rolls relatively small compared to the backing rolls above and below them, and roller bearings attached to the backing roll necks so as to be able to bear the high pressures inevitable in the operation of the mill. While Patent '195 applied to both hot and cold rolling, Patent '016 covers cold rolling only. '016 has the additional feature of the use of tension on the strip sufficient to drive, or to aid in driving, the mill. In the different claims this feature of the power drive is described in varying proportions. The all-pull mill disclosed in claims 21 and 23 is driven "entirely" by tension on the strip. The other claims describe the mill as driven "largely," "principally," and "substantially" by tension on the strip.

Apparatus claims 11 and 12, relating to continuous mills, call for "a substantial part" of the power required for driving the several stands to be supplied by tension on the strip either between the stands, or between the winding reel and the last stand; apparatus claims 24 through 26 specify that the mill, either single-stand or tandem, is to be driven "largely" by tension on the strip; process claim 22 specifies that the "principal driving power" for the mill is to be furnished by tension on the strip. As construed both by the Master and the Dis-

trict Court, the term "a substantial part" of the power required means a material part but less than 50%; the term "largely" means quantitatively more than the term "substantial," but less than 50%; the term "principal driving power" means more than 50%. Both the Master and the District Court considered that these terms contended by Republic to be vague and ambiguous, in light of the varying needs of the operation, were fully understandable by persons skilled in the art and did not render the claims invalid.

All of the considerations heretofore recited which compel the holding of patentable invention with reference to '195 compel a similar holding with reference to '016. In addition, the application of tension for the purpose of driving the rolls discloses an entirely new method of operation. While tension on the strip had been used in prior mills to prevent wrinkling, or to guide the strip through the rolls, the specific application of power to the rolls by pulling on the strip was a new conception of Steckel. It had not been disclosed in 4-high mills prior to the Steckel combination.

As to the validity of '016 Republic again renews its contention that the original application of 1923 does not support the claims which provide for driving the mill "substantially" and "largely" by tension. These terms were introduced into the 1923 application on October 17, 1929, in claims 11 and 12 and at the same time the claims which had been transferred to the original Steckel application on December 19, 1929, as claims 24 through 26 were amended to substitute the word "largely" for "principally." The specifications were amended at the same time so as to read "largely or entirely" instead of "principally or entirely." Republic claims that the original Steckel application merely disclosed that the mill would be driven "principally or entirely" by tension. It urges that the later amendments broadened the claims so that they covered the employment of lesser amounts of tension than the original application and that the

claims are invalidated because they were inserted two years after public use. The asserted public use was that of the Rome mill which the District Court found did not engage in operations arising to the dignity of public use. The District Court correctly held that under the original specifications of the original 1923 application a disclosure adequate to support the later claims was made. As stated in the specifications: "While a certain amount of power may be supplied to the rolls, it is desirable that a large part of the work be done by pulling on the strip itself * * *." Republic also contends that the product claims were not supported by the original application, that Cold Metal allowed the patent to issue with knowledge of their invalidity, that it failed to disclaim them within a reasonable time, and hence the entire patent is invalid. Cf. Marconi Wireless Telegraph Co. of America v. United States, supra. These claims are not in issue but the Patent Office in allowing the amendments determined that there was adequate disclosure in the original application to support them. Hence, Cold Metal was under no duty to disclaim the product claims and the validity of the other claims of '016 is not affected. The awareness of invalidity must be brought home to the patentee in order to give rise to the duty to disclaim. Cincinnati Rubber Mfg. Co. v. Stowe-Woodward, Inc., 6 Cir., 111 F.2d 239, 243; Ensten v. Simon, Ascher & Co., Inc., 282 U.S. 445, 453, 51 S.Ct. 207, 75 L.Ed. 453; France Mfg. Co. v. Jefferson Electric Co., 6 Cir., 106 F.2d 605, 610, certiorari denied 309 U.S. 657, 60 S.Ct. 471, 84 L.Ed. 1006.

The 98 Hot Mill is not accused of infringing '016. The remaining five mills found by the District Court to infringe '195 were found also to infringe '016 and we accept this finding.

Both the Master and the District Court held that Republic was immune from liability as to the infringements found, under the agreement executed June 20, 1927, by Cold Metal and United, from which Republic purchased the accused mills. On this phase of the case the situation of the parties shortly prior to the execution of the contract has bearing. When Steckel filed his original application in 1923 he had already built and was operating a 4-high all-pull roller bearing mill and in 1926 two other small all-pull mills were built. By December of 1925 United had installed a 4-high roller bearing mill at Rome, N. Y., with work rolls driven directly by a large motor and a reel maintaining a small amount of tension on the strip in order to pull the sheet flat and wind it on the reel.

In 1927 Cold Metal and United each had applications pending in the Patent Office relating to 4-high rolling mills and the rolling of thin material. Both of these applications were handled by the same firm of patent attorneys, which realized that it was representing clients with conflicting interests and handling applications which disclosed "common subject-matter." With the consent of both parties the law firm continued to represent them both in the prosecution of the applications. This court in United States v. Cold Metal Process Co., 6 Cir., 164 F.2d 754, held that the handling of these matters by the same firm under the circumstances did not constitute fraud. Three claims of Steckel's original application which covered the mill with the small reducing rolls, backing rolls, and anti-friction bearings were rejected by the Patent Office for lack of invention and cancelled from Steckel's application of 1923, leaving in the application only claims which covered the driving of the mill by tension, that is, '016 claims. The Biggert & Johnson application filed April 20, 1926, later assigned to United, covered 4-high mills with working rolls, larger diameter backing rolls, and anti-friction or roller bearings on the backing roll necks. With the consent of the parties these claims were pressed by Biggert & Johnson, on whose application Patent No. 1,654,235 was issued December 27, 1927. In May, 1928, all of the claims of this patent except one were inserted into Steckel's pending application and interference was requested

and granted. United did not contest the interference and the claims were awarded to Steckel because of his earlier filing date. The Patent Office then required division and the common subject matter claims describing the 4-high mills with small working rolls, backing rolls and roller bearings above described were cancelled from the Steckel '016 application and asserted in a divisional application filed December 9, 1929, upon which Patent '195 issued to Cold Metal October 21, 1930. Anticipating this result the parties on June 20, 1927, had executed the following agreement:

"Whereas, both parties own certain applications pending in the United States Patent Office relating to 4-high rolling mills and the rolling of thin material; and

"Whereas, it has been suggested to the parties by their attorneys that it may be possible to secure claims to a certain subject-matter common to both parties' applications;

"Now, Therefore, in consideration of the sum of one dollar ($1.00) and other good and valuable consideration paid by each party to the other party, the receipt of which is hereby acknowledged, and in further consideration of the mutual covenants hereinafter contained, the parties hereto agree for themselves, their successors and assigns as follows:

"1. The parties will, through their appropriate officers, immediately hold a conference at which their patent attorneys, Byrnes, Stebbins & Parmalee, shall be authorized by both parties to suggest claims covering certain subject-matter common to both parties' applications, and which it is understood are not at the present time being presented in Cold Metal's applications; together with a plan for securing the allowance of such claims;

"2. Cold Metal shall not, after such conference, present in its application claims of the scope suggested at the conference, or directed to the subject-matter common to

both parties' applications, if such claims are broader or of different scope than the claims now presented in Cold Metal's application, except with the agreement and cooperation of United.

"3. When and if such claim or claims to common subject-matter are granted in any patent issued on Cold Metal's applications, Cold Metal shall grant to United a license to make, use and sell rolling mills under such claim or claims, which license shall be exclusive to United for 4-high hot mills and for 4-high cold mills, in which the major portion of the power required by a roll stand is supplied to the rolls directly and not through tension exerted on the material for pulling it through the rolls; Cold Metal, however, reserving the right to make or have made for its own use and to use in its own plant or plants such hot and cold mills. * * * "

With the issuance of the patent to Cold Metal which completely covered the common subject-matter claims described in paragraph 3 of the agreement above quoted, Cold Metal was obligated to grant United an exclusive license as therein agreed. Republic contends that this license grants immunity under both patents to mills described in the agreement. Cold Metal concedes that under this agreement United and its customers are immune from any charge of infringement of '195 with respect to the 4-high cold mills described. It urges, however, that the license grants immunity only to mills embodying the disclosure of '195 which it claims is the patent embodying the common subject-matter claims and that immunity is not extended under the '016 claims. Cold Metal also contends that the license does not cover specific mills.

The District Court found that the accused mills were purchased from United and we accept this finding.

A preliminary question is raised by Cold Metal's further contention that the District Court's findings that five of the accused mills were operated

with the major portion of the power being supplied to the rolls directly and not through tension exerted on the strip should be reversed because it is based upon an improper computation. In other words, Cold Metal argues that if a proper method of computation had been used the District Court would have been compelled to find that the accused mills in every case employed through tension on the strip more than 50% of the total power supplied in the process and hence are not protected by the license agreement.

The method of computation attacked by Cold Metal was employed both by the Master and the District Court. Each found that the proper way to compute the tension power used on Republic's mills is to compare the amount of power supplied through forward tension on the strip with the total amount of power supplied to the mill by the mill motors and through tension on the strip. Republic uses back tension to unwind the strip, and Cold Metal asserts that the above method of computation ignores the back tension force employed in Republic's mills. It demands that in the applicable formula the back tension force be subtracted from the power of the mill motors alone. This is on the theory that the back tension is first overcome by the power exerted by the mill motor without help from the reel motor which exerts forward tension on the strip. This theory has no merit. Under this record it is clearly shown that the back tension power is one of the forces of resistance which must be overcome by the power applied to the work rolls, such as the resistance to deformation of the material being rolled and the frictional losses of the mill. The question here seems to be simple, namely, what is the proportion of tension employed on Republic mills as compared with the total power supplied by the mill motors and the reel motors. There are two sources of power, the mill motors, and the tension exerted on the strip. The question can only be answered by comparing the forward tension force with the output of the power from these two sources, which are the only forces driving the mill. To deduct the back tension alone, as found by the District Court, would ignore the other forces of resistance all of which must be overcome by the combined power of the mill motors and the reel motors. Back tension is only part of the load that must be carried and is no part of the power with which the tension exerted on the strip is to be compared for purposes of deciding infringement. We conclude that the method of computation was correct, that infringement existed in the mills listed by the District Court and that the amount of power supplied by forward tension was in each case less than 50%. In this respect the accused mills are covered by the license.

We think the judgment as to the immunity granted Republic under the license must be affirmed.

The validity of the license and its exclusive character have been declared in three opinions of the Court of Appeals for the Third Circuit: United Engineering & Foundry Co. v. Cold Metal Process Co., supra; Cold Metal Process Co. v. United Engineering & Foundry Co., 3 Cir., 107 F.2d 27; Cold Metal Process Co. v. United Engineering & Foundry Co., 3 Cir., 190 F.2d 217.

The license agreement specifically stated that Cold Metal should grant United a license to make, use and sell rolling mills under claims to the common subject-matter granted in a patent issued on Cold Metal's application. However, the exclusive license was to cover not only the 4-high hot mills and 4-high cold mills described in '195, but also mills in which the major portion of the power required was supplied to the rolls directly and not through tension. By necessary implication this provision included mills in which some power, but less than the major portion, was supplied by tension. It is significant that prior to this time United had concentrated upon the building of 4-high rolling mills for the rolling of both hot and cold strip, with tension reels which supplied only a small

amount of power to the operation. Cold Metal at the same time was particularly interested in the all-pull mills in which the entire power was derived from tension on the strip. Under these circumstances the license agreement was deliberately framed.

The Master and the District Court both found that the agreement constituted a division of the tension field. They considered that Cold Metal was then beginning to enter that part of the field in which the entire, or a major part, of the power applied to the operation came from tension on the strip. United was interested in mills in which small amounts of power were supplied through tension. This proper appraisal of the underlying reasons for the specific provisions of the agreement seems to us to take account of the respective business needs of the parties and their expectations as to the kind of mills which at the time they intended to erect and sell.

Cold Metal's answer to this view of the case is that it was a small competitor of United and that it necessarily had no thought of dividing the tension field with such a giant in the industry. This answer has some force, as also has the contention that the phrase "under such claim or claims" constitutes a limitation on the grant and covers only mills practicing the invention of '195. However, we think the court's decision is correct.

The finding that five of the accused 4-high cold mills listed in the District Court's judgment as infringing '195 also infringed '016 is a finding of fact and binding here. It compels the further conclusion that the mills which respond to the description in the license agreement are immune under the holding of this court in National Rubber Machinery Co. v. McNeil Machine & Engineering Co., 6 Cir., 132 F.2d 436, and Frederick B. Stevens, Inc., v. Steel & Tubes, Inc., 6 Cir., 114 F.2d 815, 819. These cases established the rule that where the owner of a patent grants to a licensee the right to use a patented machine, the grant carries with it by implication a license under any other patent of the licensor which would be infringed by operation under the grant. While the application of this rule depends upon the peculiar facts of each case, Lurton, J., in Edison Electric Light Co. v. Peninsular Light, Power & Heat Co., 6 Cir., 101 F. 831, it is clearly applicable here. "As a result of the agreement of 1927 United was deprived of the right to contest the granting of the claims which were copied from its own (Biggert & Johnson) application into the Steckel patent. * * The only benefit which United received for its forbearance to contest the interference proceeding was the exclusive license * * *." Cold Metal Process Co. v. United Engineering & Foundry Co., 3 Cir., 107 F.2d 27, 32. United had given substantial consideration for the contract and Cold Metal by its action for damages had itself established that the accused mills infringed Patent '016. The decisions relied on by Cold Metal are distinguishable on their "peculiar facts." Edison Electric Light Co. v. Peninsular Light, Power & Heat Co., supra. Here we apply the principle announced in the Stevens case, supra.

The fact that the machines could practice the inventions of '195 without trespassing on '016 is not decisive. The exclusive license granted covered the '016 operation where amounts of less than 50% of the power were supplied by tension.

Also immaterial is the fact, strongly relied on by Cold Metal, that it is not shown that prior to this litigation United asserted immunity under the license contract in employing the invention of '016. In Cold Metal Process Co. v. McLouth Steel Corp., D. C., 41 F.Supp. 487, 491, the court stated that "United never claimed any rights in '016"; but United was not a party to that action. In United States v. Cold Metal Process Co., D.C., 62 F.Supp. 127, the court simply found that '016 was not involved. These cases have no bearing upon the asserted fact that United for years construed the license contract as giving no immunity under '016. Cold Metal has never attempted to enforce Patent '016 against United. This is the first occasion on which immunity as to '016 could

be formally claimed. The judgment of the District Court upon the point of immunity must be affirmed.

As found by the District Court, no misuse of the patents by Cold Metal was established.

 Republic urges that the District Court abused its discretion by dividing the Master's fees between the parties and holding that neither party was entitled to recover costs. It claims that under Rule 54(d) of the Federal Rules of Civil Procedure it was entitled to costs as the prevailing party. The rule provides that "costs shall be allowed as of course to the prevailing party unless the court otherwise directs * * *." Thus the matter of costs is within the sound discretion of the court, both under the rule and under the settled law. Here there was no abuse of discretion.

As to the Master's fees, the order of reference was doubtless entered because of exceptional conditions, including a heavily congested court calendar. If so, the reference was authorized to permit the litigants to present their cases promptly without disrupting the business of the District Court. Moreover, the issues of validity and infringement of the patents on which Republic did not prevail were raised by Republic. The defense of immunity under the license occupied only a part of the trial time. The division of costs was a proper exercise of judicial discretion. Crier v. Innes, 2 Cir., 170 F. 324, 327; H. H. Robertson Co. v. Klauer Mfg. Co., 8 Cir., 98 F.2d 150.

It was proper for the District Court in its judgment dismissing the complaint on the ground of license immunity to include recitals of validity and infringement of the patents involved. In such matters the District Court has a judicial discretion, in this case properly exercised.

The judgment of the District Court in each case is affirmed.

## On Petitions for Rehearing.

The petitions for rehearing in each of these cases reiterate arguments strongly urged at the hearing and decided mainly upon the basis of concurrent findings of the Master and of the District Court in light of the applicable law.

It would serve no useful purpose to grant rehearing in either appeal, or again to detail the voluminous evidence presented before the Master and before the District Court in this controversy, which has been pending in the courts since 1942.

In light of the confusion in the record as to the Cold Metal cases litigated in the Third Circuit, adverted to and criticized by that court in its recent decision, Cold Metal Process Co. v. United Engineering & Foundry Co., 3 Cir., 190 F.2d 217, 218, Note 4, and 219, Notes 6 and 8, we make one further comment upon the contentions of Cold Metal here repeated. Cold Metal again argues that United first asserted rights under Patent '016 in 1949, that other courts have decided counter to our holding, and that United therefore obtained no rights under '016.

The District Court concluded, we think correctly, that in none of the prior litigation between Cold Metal and United was it ever adjudged that United did not acquire immunity under '016 through the license agreement. In 1931, No. 2,506, Cold Metal sued United in the United States District Court for the Western District of Pennsylvania for infringement of the '195 patent. United defended upon the ground, among others, that it was immune from any charge of infringement by virtue of the 1927 license agreement. Cold Metal Process Co. v. United Engineering & Foundry Co., 3 F.Supp. 120, 130. The court held Patent '195 valid and United immune from liability because of the license provided for under the agreement of June 20, 1927, 3 F.Supp. 120, 131. An appeal taken to the Third Circuit Court of Appeals was dismissed, 68 F.2d 564. In a later case also adjudicated in the Western District of Pennsylvania, 9 F.Supp. 994, Cold Metal Process Co. v. United Engineering & Foundry Co., United vigorously pleaded its right as exclusive licensee under Patent '195, the only

patent there involved. This suit was resolved in favor of United, but the decision was reversed, 3 Cir., 79 F.2d 666, upon the ground that no present license existed. The Third Circuit in 190 F. 2d 217 called this decision in 79 F.2d 666 erroneous. In a note, 190 F.2d 217, 221, Note 17, the court stated: "Cold Metal seems to take the position, contrary to fact, that in No. 2991 United did *not* assert its rights under the 1927 agreement and that it should have done so * * *. To state Cold Metal's position is to refute it, for * * * the very subject matter of the suit at No. 2991 was the rights of Cold Metal and United (and hence of their respective licensees and vendees) under the 1927 agreement. Both sides hotly pursued their contentions in that litigation."

The somewhat loose statement made in a previous Third Circuit decision, Cold Metal Process Co. v. United Engineering & Foundry Co., 107 F.2d 27, 30, to the effect that United appeared to be interested only in Steckel Patent '195 is deprived of force by another statement of the Third Circuit in 190 F.2d 217, 221, Note 17. It points out that between May 11, 1936, when Cold Metal filed its supplemental bill of complaint in No. 2991, and June 15, 1939, when the Third Circuit in 107 F.2d 27 affirmed the decree in D.C., 83 F.Supp. 914, between Cold Metal and United, holding that the contract of 1927 was a valid and existing contract, and that United had an exclusive license thereunder, United's license under the 1927 contract did not exist, for the Third Circuit in 79 F.2d 666 had so held. "* * * on November 14, 1939, on denial of rehearing by this court," said Chief Judge Biggs speaking for the court, "United became possessed of rights [under the license] which it could litigate."

The decision of the District Court in Cold Metal Process Company v. United Engineering & Foundry Company, 132 F.Supp. 597, sustaining the finding of a Master in 2991 as to royalty rates and amounts due Cold Metal from United under the license agreement, to the effect that Patent '016 "has not been involved in this litigation and is not the subject of the 1927 agreement" has no persuasive effect here. Since, as the District Court stated, Patent '016 was not the subject of the application filed by Cold Metal in No. 2991 November 17, 1934, praying for an injunction against United, restraining United from prosecuting two suits for the infringement of '195, and for determination of the payment due by United to Cold Metal under the terms of the license contract, the statement of the District Court, that Patent '016 is not the subject of the 1927 agreement, is dictum.

For further elucidation of this involved litigation which has lasted for over twenty years we refer to our opinion and the discussion of the points involved by the Master and the District Court in the hearings below. The holding of the District Court that Cold Metal has never sought to enforce '016 against United and hence gave United no reason to plead immunity under the license contract clearly is correct. We adhere to our decision.

The petition for rehearing in each case is denied.