**LUDWIG DRUM COMPANY, Plaintiff**

v.

**SOLAR MUSICAL INSTRUMENT COMPANY, Defendant.**

**Civ. A. No. 3965.**

United States District Court
M. D. Tennessee,
Nashville Division.

Sept. 10, 1965.

Hill, Sherman, Meroni, Gross & Simpson, Chicago, Ill., Benjamin H. Sherman, John H. Sherman, Chicago, Ill., of counsel, Bobo, Tarpley & Kingree, Shelbyville, Tenn., Ben Kingree, Shelbyville, Tenn., of counsel, for plaintiff.

Hofgren, Wegner, Allen, Stellman & McCord, Chicago, Ill., John Rex Allen, Charles L. Rowe, Chicago, Ill., of counsel, Bomar & Shofner, Shelbyville, Tenn., James L. Bomar, Jr., Shelbyville, Tenn., of counsel, for defendant.

NEESE, District Judge.

This is an action for the alleged infringement of a patent and collateral relief. 28 U.S.C. §§ 1338 and 1400(b). It originated in the Winchester Division of the Eastern District of Tennessee and was transferred to this District and Division for convenience of the parties. The undersigned judge was assigned and designated to, and did, try the action in this District without a jury on January 4, 5, 6 and 7, 1965. Post-trial pleadings have been submitted.

U. S. Patent No. 2,979,981 was issued on April 18, 1961 and is owned by the plaintiff Ludwig Drum Company, an Illinois corporation, as assignee of the alleged inventor, William Fredrich Lud-

---

wig, who filed his application for the patent on July 25, 1960. This patent relates to a method and material for making a head for a percussion musical instrument, *viz.*, a drum. The sole question necessary for decision herein is whether Mr. Ludwig's contribution to the drum-manufacturing art constituted a patentable invention, 35 U.S.C. § 101, and was something which would not have been " * * * obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains." 35 U.S.C. § 103.

The drum-making industry had long experienced difficulty in producing instruments which could be utilized outdoors in all types of weather. Eventually, a plastic material, sold commercially under the trade-name Mylar, was found to provide a drumhead material which could withstand all types of weather. However, the industry experienced new difficulty in anchoring the more slippery Mylar when pressure of the counterhoops was applied in the process of the drummer's tightening the drumhead in tuning the instrument.

Mr. Ludwig's patent application provided for the secure anchoring of the Mylar drumhead into a channel ring by means of a force-fitted spline, with the longer outer leg of the channel turned in to overlie the spline, thus maintaining the tight-fit relationship of the channel, the Mylar and the spline. This method proved highly satisfactory, and, undoubtedly, Ludwig enjoyed immediate success commercially.

The positive anchoring of a flexible or pliable sheet which can be subjected to great pressure was evolved in American industry in a period extending over a century. The Coffin patent taught the use of a spline to bind such material in a slot or channel in 1857. Watkins, in securing a chair-seat in 1870, taught the use of a spline in an appropriate slot, with the outer edge of the channel material (therein, wood) "rolled" so as to overlap the spline and thus keep it properly seated in a manner adequate to maintain the locking· pressure on the pliable material.[1]

With this state of the prior art, it can hardly be said that the juxtaposition of the Mylar between a spline and an appropriate channel to receive these two elements constituted inventive originality. Indeed, channelled drumhead rings of metal had been put into use in the drum-making industry by Bauer, Belli and Camco long before Mr. Ludwig filed his patent application.

The Bryant patent of 1911 had taught the forming of a drumhead mounted by means of a spline, with the pressure resulting from a tightening of the counter-hoop working against the spline to avoid any slippage of the material in the drumhead. Similar overlappings between the counter-hoop and the ring of the drumhead had been taught by Elkins in 1914 and Erwin in 1955, although the Ludwig application utilized an initial spline-lock by turning over the longer side of the receiving channel; the Ludwig device also has the counter-hoop operating against this turned-down edge, rather than against the spline itself, as in Elkins.[2]

---

1. The Coffin and Watkins patents, supra, appear not to have been called to the attention of the patent examiner and were probably not considered by him in connection with the Ludwig application.

2. The patent examiner initially refused Mr. Ludwig's claim 13, which taught a partrial overlap of the spline to retain it in place, observing that this claim was unpatentable over Erwin and Belli, in view of Elkins or Soderberg. He concluded that " * * * to modify the clamping means of Erwin or Belli by the clamping apparatus shown in Elkins or Soderberg would be well within the scope of mechanical skill and merely a matter of choice and design. * * *"

The contrast between a partial overlap of the spline, which the patent examiner rejected as being unpatentable, and the complete overlay provided for in the Ludwig application is merely a matter of choice and design, a difference lacking meaningful distinction. Preformed Line

Additionally, there was on the market in the United States sometime between 1956 and 1958 the Camco drumhead mounting. This device was basically similar in function to the Ludwig apparatus, although Camco's approach was slightly different: Camco utilized a solid round wire as the spline, fitted it into a circular channel, with the channel ends rolled in, thereby effectuating a clamping device to hold the spline against the Mylar. A small amount of epoxy was used during the Camco manufacturing process so the Mylar head would not slip during manufacture, but the epoxy was not used to hold the Mylar after the two top lips of the spline had been rolled, and the manufacturing process of Camco was completed.[3]

■ The Court need not consider any of the other issues in this action if the Ludwig drumhead assembly is invalid for lack of "invention". The standard of patentability is a constitutional standard, and the question of the validity of a patent is a question of law. Monroe Auto Equipment Co. v. Heckethorn Mfg. & Supply Co., C.A.6th (1964), 332 F.2d 406, 409–411, certiorari denied (1964), 379 U.S. 888, 85 S.Ct. 160, 13 L.Ed.2d 93.

■■ The Court finds and concludes that Mr. Ludwig "* * * added nothing to the total stock of knowledge, but has merely brought together segments of prior art and claims them in congregation as a monopoly. * * *" Great Atlantic & Pacific Tea Co. v. Supermarket Equipment Corp. (1950), 340 U.S. 147, 71 S.Ct. 127, 95 L.Ed. 162, 167. For such a congregation to rise to the status of invention, a combination of old elements must "* * * co-act to pro-

duce the result achieved, the result must be new and useful, and the method of operation must be new. * * *" Cold Metal Process Co. v. Republic Steel Corp., C.A.6th (1956), 233 F.2d 828, 838, certiorari denied (1956), 352 U.S. 891, 77 S.Ct. 128, 1 L.Ed.2d 86.

Mr. Ludwig's ultimate assembly, in the Court's opinion, is nothing more than a combination of several well-known techniques. When use of a square spline (cf. Coffin, fig. 5 or Watkins, fig. 2) is utilized to anchor pliable sheet material in a square channel (cf. Bryant, figs. 2 and 5 or Norquist, figs. 2, 8 and 10–12), wherein the outer rim is folded over the spline, whether partially or completely,[4] and wherein application of tension by means of the counter-hoop transmits further locking pressure on the spline (cf. Erwin, fig. 2 and Camco), then the Ludwig application is duplicated completely, or so nearly so that such assembly of known apparatus is well within the scope of mechanical skill of a person skilled in the art.

If, thus, Mr. Ludwig "* * * is merely the first to utilize the existing fund of public knowledge for new and obvious purposes [he] must be satisfied with whatever fame, personal satisfactions or commercial success he may be able to achieve. Patent monopolies, with all their significant economic and social consequences, are not reserved for those who contribute so insignificantly to that fund of public knowledge. * * *" Dow Chemical Co. v. Halliburton Oil Well Cementing Co. (1945), 324 U.S. 320, 328, 65 S.Ct. 647, 650, 89 L.Ed. 973, 980.

Wherefore, the Court concludes that the patent owned by the plaintiff was im-

---

Products Co. v. Fanner Mfg. Co., C.A.6th (1964), 328 F.2d 265, 272 [8], certiorari denied (1964), 379 U.S. 846, 85 S.Ct. 56, 13 L.Ed.2d 51; Harvey v. Levine, C.A.6th (1963), 322 F.2d 481, 485 [7].

3. The originator of the Camco method obtained no patent on his device. His attorney died while his application was being prepared formally for presentation to the Patent Office. The originator

did not know of the death of his attorney until after the Camco device had been on the market for more than one year. 35 U.S.C. § 102(b).

Neither was the Camco product called to the attention of the patent examiner in relation to the Ludwig application.

4. Cf. Patent soft cover, p. 19, examiner's observations, supra.

providently issued and is invalid, and that the plaintiff is entitled to no relief under its complaint.

The clerk will prepare, sign and enter a judgment dismissing the complaint herein.