**SPARTON CORPORATION, Plaintiff-Appellant and Cross-Appellee,**

v.

**EVANS PRODUCTS CO., Defendant-Appellee and Cross-Appellant (two cases).**

**Nos. 14330, 14331.**

United States Court of Appeals Sixth Circuit.

Aug. 30, 1961.

Townsend F. Beaman, Jackson, Mich. (Beaman & Beaman, Jackson, Mich., Casper W. Ooms, Robert C. Williams, Ooms, McDougall, Williams & Hersh, Chicago, Ill., on the brief), for Sparton Corp.

Cyrus G. Minkler, Detroit, Mich. (Robert L. Boynton, Arthur W. Dickey, Detroit, Mich., on the brief), for Evans Products.

Before MARTIN, WEICK and O'SULLIVAN, Circuit Judges.

MARTIN, Circuit Judge.

One of the problems long confronting railroads concerned the damage to goods in shipment resulting from movement of the freight within a freight car while in transit. An early attempt at solution, still practiced today, was the use of disposable wooden braces. Bracing used in cars to hold the freight in position is called "dunnage." This wooden disposable dunnage was nailed into position in the car so as to secure the freight against movement. The walls and floor of the car were lined with wood to receive the nails. After frequent use, this lining had to be replaced, inasmuch as repeated nailings destroyed the wood to such extent that the braces could not be fastened securely to the wall, or floor. The worn-out wooden braces were discarded.

In search of a more efficient manner of protecting freight, methods were sought to develop a dunnage system that could be installed in the car permanently, the braces being fixed so as to allow adjustability in the fitting of various goods and packages into the car for shipment. The work in this field resulted in the three devices—among others—which are the subject of the three patents in suit and in the dunnage system of appellant which

is alleged to infringe the patented devices. Appellee is the owner of the three patents involved.

Judge Thornton of the United States District Court for the Eastern District of Michigan held that the three patents in suit (Nampa, No. 2,679,214; Chapman-Dunlap, No. 2,834,304; and Tobin, No. 2,873,695) are valid; and that the alleged infringing device of appellant, the Sparton Tri-Belt Loader, infringes the Chapman-Dunlap and Tobin patents, but does not infringe the Nampa patent.

In the District Court proceedings, it was admitted that, if the Chapman-Dunlap and Tobin patents were valid, the Sparton Tri-Belt Loader did infringe. Therefore, in relation to the Chapman-Dunlap and Tobin patents, this court is concerned only with the question of validity. However, in considering the Nampa patent, not only is the question of validity presented, but also the issue of infringement. While the District Court found non-infringement of Nampa by appellant's Tri-Belt Loader, the owner of the Nampa patent (appellee Evans Products Company) has cross-appealed, claiming infringement. Sparton Corporation urges that, having found non-infringement, it was error for the District Court to consider the question of validity of the Nampa patent.

In appealing from the District Court's holding of validity as to all three patents, appellant Sparton Corporation argues (1) that the correct standard of invention was not applied by the court; (2) that the rule of exhausted combination would preclude a holding of validity, each of the claims in suit being an aggregation rather than a patentable combination, and therefore invalid; and (3) that the District Court decided a moot question when it found validity after finding non-infringement.

Sparton contends further (4) that structures conforming to the disclosures of the Nampa patent in suit were offered for sale and were in public use more than one year prior to application for that patent, thereby rendering it invalid. The same contention is made regarding the Chapman-Dunlap patent. Appellant also claims (5) that the District Court was in error when it found that Robert Schroeder (a former employee of appellee Evans Products Company, owner of Nampa) did wrong in taking his freight-bracing system to Sparton. It contends, moreover, (6) that certain amendments to the Chapman-Dunlap and Tobin applications render those patents invalid.

We think that the contentions of appellant are without merit.

The Evans Company has cross-appealed, arguing that the holding by the United States District Court of non-infringement of the Nampa patent by the Sparton Tri-Belt Loader is in error.

A brief description of each of the patents involved and of the Sparton Tri-Belt Loader becomes necessary.

### Nampa Patent, No. 2,679,214.

The dunnage system constituting the subject of the Nampa patent consists of a series of upright bars, arranged at opposite sides of the freight car, with wall members or belt rails, removably supported on the uprights at desired heights. Connecting the belt rails from side to side are car-spanning, load-bracing, cross bars. The bars are removably and adjustably supported upon the rails.

Each cross bar is comprised of an elongated body, having heads at each end. The bar itself is composed of a "Z" shaped metal reinforcing member, sandwiched between two-by-fours, thereby presenting four uninterrupted, "buffered" freight-engaging surfaces extending from end to end of the bar. The heads, being smaller than the bar, do not extend beyond the bar and no contact is made with the freight. This enables the loading of freight over the entire width of the car.

Each head has a series of tooth-like projections that mate with similar projections on the wall members and prevent movement of the heads. Fore and aft movement of the bars is thereby prevented. Each head also contains a lip and a vertical face which are received by the wall members to avert lengthwise move-

ment between the wall member and the bar assembly. A latch is incorporated in the head and underlies the wall member, maintaining the position of the tooth-like projections and the lip and vertical face in contact with the wall member. This aids in preventing excess movement between the head and the wall member. One head is immovably secured to the bar, but the other is fastened by an enlongated neck which is freely slidable between limits in a socket moored to the "Z" shaped member, thereby enabling the bar length to adjust itself to changes of car width that may be caused by the car walls' ballooning in transit, or by the car's being bumped during yard operations.

In use, the freight is placed in the car and the bar is located on the wall members so as to engage the freight and hold it in position. Inasmuch as the wall members are movable, the cross bars may be placed in almost any position in the car, fore or aft, or from the floor to the ceiling.

Chapman-Dunlap Patent, No. 2,834,304.

The Chapman-Dunlap equipment to hold cargo in place on ships was developed in research and development contracts with the United States Navy, but it may be used in freight cars, as well.

The system is composed of grid-like patterns of long structural supporting surfaces, or belts, on the freight-supporting surfaces of the ship, or car, running lengthwise with the ship, or car, and spanned at intervals by belts. The corresponding overhead structures have matching grid-like patterns. The surfaces are provided with three equidistantly-spaced rows of identical holes, the spacing between the holes in each row being equal to that between the rows.

Upright or vertical bars extend between the floor and the overhead surface. Each bar has an elongated body and end heads, or fittings, with one fitting fixed in place on the body. The other fitting on the bar is telescopically received into the body of the member, so as to provide for changes in the length thereof when in service and when being put into place, or removed. Each end fitting carries a pair of laterally-spaced parallel, load-bearing pins that enter the holes in the floor and ceiling surfaces. The pins are spaced from each other a distance equal to twice the distance between the rows of holes. The end fitting, fixed in place on the bar, carries a latching pin pivotally mounted thereon which extends generally parallel to the two load-bearing pins, is placed between them, and is protected thereby. The latching pin has a latching shoulder that lies behind the metal surrounding one of the holes and prevents withdrawal of the head.

The three rows of holes in the floor, the overhead surface, or belts, and the matching arrangement of the load-bearing and latching pins on the vertical bracing bars permit flexibility and freedom in the positioning of these bars, thus enhancing the load-handling ability of this equipment.

The Chapman-Dunlap structure includes tomming members, or bars, that span—and are removably secured to and supported by—the vertical bars. These bars are symmetrical, end for end, and have two identical latching-type end fittings that duplicate the end fittings of the vertical bars. Both end fittings are telescopically received into the bar body. Locking assemblies may be used to fix the length of the bars after they are installed between the verticals.

Tobin Patent, No. 2,873,695.

The Tobin patent is directed to a freight-holding system, having the particular feature known as "pitch splitting." This feature makes possible finer adjustments of the position of the freight-holding bar with relation to the freight, so as to take up any gap between the bar and the freight and to provide a snug and secure fit.

The Tobin freight-holding bars have their ends engaged in holes provided in the vertical surface of wall supports, or plates. Each end of the bar is provided with a pair of laterally-spaced load-bearing pins which enter adjacent pairs of holes in the wall supports. One pair of the pins is telescopically mounted.

The holes are arranged in equidistantly-spaced vertical and horizontal rows. Consequently, the bar can be attached to the wall supports in any one of four axially rotative positions, each spaced 90 degrees apart, and therefore each bar face can be caused to face or be presented in any one of four directions.

The pins on the respective end fittings of the bars are aligned with each other endwise to the bar; but they are off center or eccentrically located relative to the longitudinal axis of the bar. Because of this eccentricity, shifting of a bar from one axially rotative position to another shifts the position of the four faces of the bar, letting a workman select the position which most snugly secures the freight in position in the car. This feature allows finer adjustments in the position of the bar than could be achieved by moving the bar to the next set of holes.

### The Sparton Tri-Belt Loader.

The Sparton Tri-Belt Loader is similar to the patents in suit, described above, as is evidenced by the admission in the United States District Court that the Tri-Belt infringed the Chapman-Dunlap and Tobin patents.

The desired result of holding freight in position in freight cars is accomplished with the loader, by the use of a cross bar to engage and hold the freight. At each end of the bar is located a bar head, used to attach and secure the bar to the supporting wall members. One of the bar heads is freely telescopic in relation to the bar body, to allow for motion of the car walls without dropping the load. The bar heads are attached to the wall members. or belt rails, by three pins. These pins are inserted into the holes in the belt rail, with the center pin of the three serving as a latch. The two outside pins are the load-bearing pins and are parallel. The pins of the Sparton Tri-Belt Loader are mounted eccentrically on the bar head, thus permitting pitch splitting: that is, fine adjustments of the bar, by rotating the bar about its longitudinal axis.

The receiving holes in the wall members are arranged in three horizontally disposed rows, the distance between adjacent holes in each row being equal to the distance between rows. The spacing of the load-bearing pins is equal to twice the distance between rows and between holes in each row. Therefore, the bar head may be inserted in a single horizontal row, or aligned vertically in holes in each of the three rows.

In use, movement of the bar head transverse and vertical to the length of the bar is precluded by load-bearing pins; and movement parallel to the length of the bar is prevented by a latch pin.

Appellant Sparton contends that the trial judge did not apply the correct standard of invention to test the validity of the three patents involved here. The applicable standard is set forth in Title 35, section 103, U.S.C.A., which states: "A patent may not be obtained though the invention is not identically disclosed or described as set forth in section 102 of this title, if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains. Patentability shall not be negatived by the manner in which the invention was made."

■ In considering the validity of the patents here in question, the trial judge made detailed inquiries and comparisons regarding the prior art in relation to each of the patents in suit. This court has done the same and is of strong opinion that those patents urged by appellant as having made the Nampa, Chapman-Dunlap and Tobin patents obvious to one of ordinary skill in the art, thereby rendering the three patents in suit invalid, clearly do not accomplish that result. The findings by the trial judge on this matter are well reasoned and supported by the evidence in the case; and his finding that none of the three patents in suit would have been obvious to one of ordinary skill

in the art as a result of the prior art cited by the appellant will not be disturbed.

In arguing that the patents in suit are invalid because all claims of the patents are those which call for structures previously used in the freight-bracing art and therefore are invalid under the rule of exhausted combination, appellant Sparton relies entirely on the authority of Lincoln Engineering Co. of Illinois v. Stewart-Warner Corp., 303 U.S. 545, 58 S.Ct. 662, 82 L.Ed 1008. The crux of the Lincoln Engineering case is the principle that where one develops a combination in which all the elements are known in the art and the only invention involved is that of a better component contained in the combination, one cannot claim the entire combination. While an individual component might have the required inventiveness, the inclusion of such patentable component does not make the entire combination patentable as such. To allow the applicant to claim the entire combination would be to allow him to claim more than he invented, which, of course, would be repugnant to the entire purpose of the patent system.

There is no argument with the holding of the court in Lincoln Engineering case. The only question concerning the principle stated therein is whether or not it has proper application in the case at bar.

■ It is true that a single patentable component will not make an entire combination of old elements patentable, but it has long been held in this circuit that a new combination of old elements, resulting in a new method of operation is patentable as a combination. Ferro Concrete Const. Co. v. Concrete Steel Co. et al., 6 Cir., 206 F. 666; Proudfit Loose Leaf Co. et al. v. Kalamazoo Loose Leaf Binder Co., 6 Cir., 230 F. 120; Ohio Rake Co. v. Bucher & Gibbs Plow Co., 6 Cir., 266 F. 891; Michigan Carton Co. v. Sutherland Paper Co. et al., 6 Cir., 29 F.2d 179; Cold Metal Process Co. v. Republic Steel Corp., 6 Cir., 233 F.2d 828.

It is also true that the components constituting the patents in suit were known earlier in the freight-bracing art. Speaking broadly, the components are the bars, the bar heads and the wall members attached to the car. Patentability of combinations of old elements may be found when the elements co-act to produce a new result by a new method of operation. As we said in Cold Metal Process Co. v. Republic Steel Corporation, 6 Cir., 233 F.2d 828, at page 836: "The controlling question is whether this combination has a new method of operation, and whether the new and useful results were obtained in a manner which was or was not obvious to persons of ordinary skill in the art. American Chain & Cable Co., Inc. v. Rochester Ropes, Inc., 4 Cir., 199 F.2d 325."

■ In the Nampa patent is found, for the first time in the freight-bracing art, the feature of telescopic heads that co-act with the bars and wall members to produce a freight-bracing device to alleviate the dropping of the goods in transit. This constitutes a new method of operation that meets the test set forth in the Cold Metal Process case, supra.

In the Tobin patent, we find the pitch-splitting feature. This also achieves a new result in the freight-loading field. By combining this new feature with the known elements of the art, a new result was achieved—that is, a new and easy method of snubbing up the freight which, before, had not been possible to such degree without the use of extra wedges, etc.

One of the problems in designing a freight dunnage system, to be installed permanently in the freight car, is the provision for flexibility and versatility in positioning of the freight-holding bars. Any given freight car will carry vastly different loads from time to time, each requiring a different placement of the bars adequately to secure the goods in transit. Although the Nampa and the Tobin systems permitted some adjustment in the general placing of the bars, the Chapman-Dunlap system goes farther; and, by arrangement of the three-hole wall-member system, provides great flexibility in the possible location of the bar. The three equally spaced holes in each wall member, combined with the two-load-bearing pins

and the latch pin on the bar head, enable the bar to be placed in a variety of positions and heights. The co-action of the three-hole wall-member system with the other elements of the system results in a new effect not before achieved in this field, thereby meeting the test of the Cold Metal Process case.

The question of whether or not the courts should decide the validity or invalidity of patents in suit, when no infringement has been found, often has been presented to this court. Landis Machinery v. Chaso Tool Co., 6 Cir., 141 F.2d 800; Pennington Engineering Co. v. Spicer Mfg. Corporation, 6 Cir., 165 F.2d 59; Dow Chemical Company v. Skinner, 6 Cir., 197 F.2d 807; Whitman et al. v. Andrus, 6 Cir., 194 F.2d 270; Thabet Mfg. Co. v. Kool Vent Metal Awning Corp. of America, 6 Cir., 226 F.2d 207.

In the Thabet case, the patent in issue had expired before this court had presented to it the question of whether to consider validity after a finding of non-infringement. The court there stated [226 F.2d 207, 211]: "In view of that fact [the expiration of the patent] and our ruling against infringement, we find it unnecessary to rule on the question of the validity of the patent in issue." The court then cited the Dow Chemical case and the Landis Machinery case. In the Dow Chemical case, the patent had also expired, so the question of validity was deemed moot and a ruling on validity was consequently not to be required. However, in the Dow opinion, the court quoted from Sinclair & Carroll Company v. Interchemical Corporation, 325 U.S. 327, 330, 65 S.Ct. 1143, 1145, 89 L.Ed. 1644: "There has been a tendency among the lower federal courts in infringement suits to dispose of them where possible on the ground of non-infringement without going into the question of validity of the patent. * * * It has come to be recognized, however, that of the two questions, validity has the greater public importance. Cover v. Schwartz, 2 Cir., 133 F.2d 541, and the District Court in this case followed what will usually be the better practice by inquiring fully into the validity of this patent."

It was thus seemingly left to the discretion of the lower court to determine whether decision on the question of validity was required. This court reasoned that the use of the word "usually" by the Supreme Court in the Sinclair case gave discretion to the lower court. This reasoning was strengthened by the fact that two earlier cases decided by the highest court [Electrical Fittings Corporation v. Thomas & Betts Co., 307 U.S. 241, 59 S.Ct. 860, 83 L.Ed. 1263, and Altvater v. Freeman, 319 U.S. 359, 63 S.Ct. 1115, 87 L.Ed. 1450] were not cited in Sinclair. In those cases, the holding was that, where there was non-infringement, validity should not be adjudicated.

The trial court here had before it the consideration of three patents, two of which were conceded to be infringed. All three involved freight dunnage; and the device alleged to infringe the patents in suit was also a freight-dunnage system. In such posture, we think the best policy was for the District Court to consider the question of validity of Nampa, even though it was found that the patent had not been infringed. Inasmuch as the three patents and the alleged infringing device were all of similar nature, it would not seem reasonable to require the trial court to decide the issue of validity of two of the patents and to leave the third undecided. The appellant was successful in proving non-infringement of the Nampa patent. Why should it now contest the finding of validity, unless, for some undisclosed reason, it is interested in the validity of the Nampa patent? If the corporation does have a rightful interest in the patent's validity, it would seem better to have the question decided as it was, rather than to instigate another action to try an issue so closely interwoven with the present case. It does not appear that the appellant was in any manner prejudiced by the decision concerning validity. Thus, it was in keeping with the public-policy statement in the Sinclair Company case, supra, for the

District Court to decide the issue of validity.

It is contended by appellant that the Nampa and the Chapman-Dunlap patents are invalid because structures conforming to the disclosures of those patents were in public use and offered for sale more than one year prior to the application for the patents.

This contention raises an issue of fact. On this point, the trial judge made detailed and specific findings of fact to the effect that neither the Nampa nor the Chapman-Dunlap patent is invalid because of public use or of being offered for sale more than one year prior to the application for the respective patents. A careful examination has been made of the findings of fact of the District Court and of the evidence supporting such findings. We are of opinion that, on this factual matter, the findings of the trial court are amply supported by substantial evidence and are not clearly erroneous. Therefore, the finding of the District Court, that there was no public use or offer of sale of the patents more than one year prior to the applications therefor, will stand.

The argument has been advanced that the District Court did not apply the correct legal standard of employee liability, in deciding that Robert Schroeder was wrong in taking his freight-bracing system to the Sparton Corporation rather than carrying it back to Evans Products Company, his former employer. In support of this argument, appellant cites Bickley et al. v. Frutchey Bean Co., 6 Cir., 279 F.2d 685. That case was an action for alleged disclosure of trade secrets and was originally brought *ex contractu* as a common law action. The contract aspect was dropped; and the case proceeded to judgment on the common law action. We do not see the relevancy of the Bickley case here.

The important matters under consideration in the present controversy are the validity of three Evans-owned patents and the question of whether or not those patents are infringed. Infringement is admitted in the case of the Chapman-Dunlap and Tobin patents; and the court found non-infringement of the Nampa patent. Therefore, the actions of Robert Schroeder are unimportant in considering the question of infringement. As to the validity of the three patents in suit, we fail to see how the conduct of Schroeder would have any influence at all on ultimate determination of the matter.

In pondering the validity of the three patents in suit, we have considered the prior art, the presence of invention, the public use or sale more than one year prior to the time of application for the patent, and other pertinent factors. But whether an employee of the owner of the three patents in issue disclosed certain information, which may or may not have resulted in development of an infringing device by a competitor, would have no bearing on the validity of the three patents owned by his former employer. It is urged that the fact of Schroeder's having been a former Evans employee, who made certain disclosures to Sparton, was kept constantly before the court, but that the court should not have been influenced thereby. This argument must fail, for there is no showing that the trial court, in determination of the case, was actually influenced by the actions of Schroeder.

The validity of the Chapman-Dunlap patent is attacked on the ground that certain amendments thereto amount to an introduction of new matter. The amendment challenged is that of changing the word "is" to "may be" in line 29, column 8, of Patent No. 2,834,304. The change relates to the telescopic features of the freight-holding bars. Sparton contends that, as originally stated, the word "is" conveyed the implication that the locking pin would be positioned in the bar, thereby locking it into position; and that it was only after the amendment (changing "is" to "may be") that the telescopic feature could be claimed. We think that the rule applicable to this situation was stated by this court in Coats Loaders & Stackers, Inc. v. Henderson, 6 Cir., 233 F.2d 915, 923.

Appellant Sparton has attempted to bring the presently questioned amendments within the doctrine reiterated in Muncie Gear Works v. Outboard Marine & Manufacturing Co., 315 U.S. 759, 62 S.Ct. 865, 86 L.Ed. 1171: that an application for a patent cannot be broadened by amendment to embrace an invention not disclosed in the application as filed, when adverse rights of the public have intervened. Here, as was stated by Mr. Justice Stewart (then a member of this court) in the Coats Loaders case, supra: "The ultimate question is: was the invention which is now claimed disclosed in the original application, or was it not disclosed until the amendment * * *."

In our opinion, the telescopic nature of the freight-holding bars was disclosed in the original application. Mention of the telescopic feature was made in the application in lines 20–21, page 8; in lines 7 and 14, page 16; and in line 6, page 19. The mention at these places, coupled with the detailed drawing showing the telescoping character of the bars, constitutes ample disclosure upon which the subsequent amendments could rest.

With reference to the Tobin patent, the amendment which Sparton contends to be violative of the spirit of the Muncie Gear case involved the feature known as "pitch splitting." Pitch splitting is rotational variation of the position of the freight-holding bar in relation to the freight, so as to take up any space that would allow small movements of the cargo. This is accomplished in the Tobin patent by the eccentric location of the load-bearing pins, which attach the bar to the wall member. The original application did not expressly use the term "pitch splitting" but it did state: "It will be seen that the two pins 17 are eccentric with respect to the center line of the bar 61. Various spacings can therefore be obtained by turning the bar about its center line." This language would seem to be a clear disclosure of the practice known as "pitch splitting," for it describes exactly what is done when pitch splitting is used to secure freight: that is, the bar is turned, presenting various spacings in relation to the freight

and thereby allowing fine adjustments to be made in securing the freight in position.

By cross appeal, Evans Corporation challenges the finding of the District Court that the Nampa patent was not infringed by the Sparton Tri-Belt Loader. The Tri-Belt Loader and the Nampa system were intended to accomplish the same result: to hold freight in position in freight cars to prevent damage in transit and yard operations. Observation of the two systems in question reveals at once differences in construction, design and method of operation.

The Sparton Tri-Belt depends upon two parallel pins to take the load of the freight, while the Nampa system utilizes two intermeshing rows of projections (much like saw teeth) to hold the load and prevent movement. To latch the bar to the wall member, the Sparton Loader uses a third pin, adapted to latch the bar to the wall member and prevent disengagement. This securing is accomplished in the Nampa mechanism by a cam-like lock that fits under the smooth edge of the serrated wall member, pulling the projections of the bar head down securely into the matching serrations of the wall member. The member is thereby prevented from vertical and transverse movement in relation to the bar.

To hinder movement parallel to the length of the bar, the Nampa apparatus contains a lip, extending from the head member of the bar, which fits over the wall member and secures the bar. In the Tri-Belt Loader, both vertical and horizontal movement is prevented by the center pin which is shaped so as to function as a latch. Also, by arrangement of the holes in the wall members into which the load-bearing and locking pins of the bar head fit, the Sparton equipment enables the loaders to rotate the bar so as to achieve various bar settings in relation to the freight. This allows four degrees of pitch splitting, or fine adjustment of the bar against the freight, by rotation of the bar about its longitudinal axis. This pitch-splitting feature is not found on the Nampa equipment.

A careful examination of the actual bar heads and wall members in question, along with the detailed drawings and specifications of the equipment here questioned, leads us to the conclusion that the United States District Court was correct in finding that the Sparton Tri-Belt Loader did not infringe Nampa patent, No. 2,679,214.

For the foregoing reasons, the judgment of the District Court is, in all respects, affirmed.