**UNITED STATES PLYWOOD CORPO-
RATION, Plaintiff-Appellee,**

v.

**GENERAL PLYWOOD CORPORATION,
Defendant-Appellant.**

**UNITED STATES PLYWOOD CORPO-
RATION, Plaintiff-Cross-Appellant,**

v.

**GENERAL PLYWOOD CORPORATION,
Defendant-Cross-Appellee.**

**Nos. 16194, 16195.**

United States Court of Appeals
Sixth Circuit.

Dec. 28, 1966.

Morris Relson, New York City, for United States Plywood Corp., Heilman & Heilman, James M. Heilman, Darby & Darby, William F. Dudine, Jr., New York City, of counsel.

John A. Blair, Detroit, Mich., for General Plywood Corp., Everett R. Casey, Harness, Dickey & Pierce, Detroit, Mich., Arthur F. Robert, Louisville, Ky., on brief.

Before PHILLIPS, EDWARDS and CELEBREZZE, Circuit Judges.

EDWARDS, Circuit Judge.

These appeals represent the culmination of a bitter controversy between a giant member of the plywood industry and a somewhat smaller competitor.

United States Plywood is the biggest of American plywood manufacturers. General Plywood is a substantial manufacturer of plywood doors based in Louisville, Kentucky. At the relevant times in this record the whole industry was adversely affected by the entrance into the United States market of Japanese plywood imports. And at the time also more and more plywood panels were being sold in factory finished form for interior use in housing and office building.

The industry prepared such panels for factory finishing (or for sale to the construction industry unfinished) by running the panels through a series of machine sanders (usually three). The first such machine employed a rough sandpaper of 1/0 grit; the next two were progressively finer. It appears that the finest in general use by the industry at this stage, prior to the event we deal with, was 4/0 grit.

This sanding produced plywood panels ready for finishing and termed in the industry "wood in the white." The surface while relatively smooth was porous, somewhat fibrous, absorptive and without gloss or sheen.

Subsequently, to change all these surface characteristics, finishing required filler, stain, lacquer and polishing. Each of these processes when done at the factory required one or more machine passes with consequent production costs.

In 1954, George E. Alexander, Production Manager of General Plywood, conceived the idea of "buffing," "polishing," or "burnishing" the "wood in the white" panel at this stage before the finishing process. He first tried a cloth buffing wheel which produced some of the effect he was seeking, but with irregularities, including scorch marks, which made the result unsatisfactory. Pursuing the effort, Alexander experimented with a patented "Timesaver" machine, which was capable of production processing of plywood sheets. This machine had adjustable feed and roll speeds and roll pressures. Ultimately Alexander ordered a specially constructed Timesaver with a 38-inch roll. The only individual feature added to this machine (other than width) was a special "soft contact roll."

Alexander discussed his proposed process with one Oliver S. Judd, of Minnesota Mining & Manufacturing Company (a leading abrasive manufacturer) and inquired as to what was "used to polish hammer handles." Judd answered, "cork belts," and Alexander thereupon ordered a specially fabricated 38-inch

wide cork belt for the Timesaver machine. Both the Timesaver machine and the 3M cork belt were the subject of pre-existing patents. But it does not appear that the two had previously been employed in combination to "buff," "polish," or "burnish" wood in the white plywood panels. When feed speed and roll speed and pressure were adjusted so that panels were fed through the machine at approximately 90 feet per minute, with a one inch (or less) band of contact where surface heat of upward of 400 degrees was generated, the effect which Alexander was looking for was produced. The surface was smoother, glossier, less absorptive, and (as Alexander termed it) "densified." Alexander called the new process "microsealing."

In these stages Alexander worked closely with Judd of 3M and with Pendergast of Timesavers. When Alexander became convinced that he had a commercially valuable process (he terms it "revolutionary"), he (and General Plywood) set out to patent it. At that point General Plywood discovered that Judd, on behalf of 3M, had also applied for a patent without notice to Alexander or General Plywood.

Judd's patent application was dated March 27, 1956, and on October 9, 1956, the patent was granted to him. Alexander's patent application was dated October 10, 1956 [1] and the examiner denied the patent.

Subsequently, the Board of Patent Appeals reversed the examiner and granted the Alexander patent, after finding it not anticipated by prior-art (apparently including the Judd patent). Litigation between General Plywood, assignee of Alexander's patent, and 3M, assignee of the Judd patent, resulted in dedication to the public of the Judd patent and an agreement by 3M not to contest validity of the Alexander patent.

The Alexander patent is best described briefly, we think, by quoting Claim 11:

"The method of providing a substantially flat wood surface with a glossy and relatively non-porous finish comprising; non-abrasively buffing the surface with a buffing medium having a flexible yielding relatively non-abrasive frictional heat insulating rubbing surface moving at a predetermined buffing speed, compressing the buffing medium between a backing member and said wood surface to press the buffing medium into firm and intimate contact with said surface; and correlatively controlling the buffing speed, pressure and time to compress, pressure smooth and densify the surface wood without scorching."

For further consideration, particularly of the problems of validity and infringement, other paragraphs elaborating the process described in the Alexander patent application are relevant:

"The principal object of this invention is to provide a novel wood surface treating process which can be simply and inexpensively carried out and which results in the substantial improvement of that surface in one or more respects such as increased hardness, smoothness and reflectivity and reduced porosity and absorbency.

"Another important object is to provide a wood glossifying process which can be performed at high speed on a straight through production line conveyor.

"Another important object of this invention is to provide a novel and inexpensive frictional method for changing the structure of the wood along the surface without changing the underlying structure and, through such change, to effect a substantial increase in surface smoothness and a substantial decrease in its ability to absorb finishing or other materials.

"Another object of this invention is to provide a new and novel process for producing a wood product having its surface wood structure of relatively greater density and finer texture than

---

1. Alexander had previously filed a "first application" in relation to much the same process on February 20, 1956. This application ultimately was abandoned.

the density and texture of the underlying natural wood structure."

*   *   *   *   *   *

"It should be noted that I preferably employ a surface treating belt of the type having a cork surface, e. g., as exemplified by the belts presently made under U. S. Patent No. 2,542,058, except that the very mild abrasive sometimes employed in such cork belts is unnecessary and may be omitted. Any other flexible, yielding, relatively nonabrasive frictional rubbing medium or frictional belt material, such as canvas, or other cloth made of natural or synthetic fibers, may be employed so long as it is capable of frictionally developing the requisite temperature when the requisite operating conditions are employed, and of withstanding both the operating temperatures and pressures. It will be observed that these belts provide a flexible, frictional, relatively nonabrasive buffing or rubbing and somewhat yielding surface composed of nonmetallic material. Since this material, in comparison with metal, is a relatively poor conductor of heat or a good heat insulator, it may be aptly described as a heat insulating material."

*   *   *   *   *   *

"The process, however, is essentially a nonabrasive process, as is clear from the fact that even a very light pencil mark made on a piece of wood before treatment is not removed therefrom during the surface treatment."

*   *   *   *   *

"[S]uperior results are achieved by the apparatus illustrated in the drawing wherein the surface of the wood is heated directly by friction and it is a simple matter to obtain relatively uniform pressure between the friction member and all portions of the wood surface and hence uniform heating and densification even though the wood surface is not perfectly flat. In that connection, the use of a rubber or other yielding sleeve on drum 10 helps to distribute the pressure uniformly over the surface even though

the surface is not perfectly flat and the sheet of wood is relatively rigid. *  *  * "

"It is extremely difficult to determine the precise temperatures and pressures which obtain in the practice of this invention with the apparatus of the drawing. I am well satisfied that the minimum temperatures employed should fall within the softening-melting range (400° F. to 525° F.) of the heat plasticizable content of the wood. I am equally well satisfied that the momentary operating temperatures employed may and preferably do greatly exceed that range so long as the contact time is reduced sufficiently to prevent charring of the surface wood in all instances and scorching in those instances where it is objectionable.

*   *   *   *   *

"Since the desired results are achieved when the temperatures developed are high and only surface wood is heated it is desirable to complete the treatment with the apparatus of the drawing within a time period of no more than $\frac{1}{5}$ of a second, and preferably within a period not exceeding $\frac{1}{18}$ of a second. The period of treatment is determined by the width of the wood surface contacted under pressure by the friction member and the rate of feed of the work. With a 16-inch rubber covered drum it is estimated that the width of the band of contact is no more than $\frac{3}{4}''$ when the pressure applied by feed roller 21 is $7\frac{1}{2}$ pounds per lineal inch of roller length.

"The temperature developed during the treatment for any given rate of work feed and width of pressure contact depends on the pressure and the belt speed, increasing as either or both of these factors increase and vice versa. The best results are achieved when the temperature developed closely approaches the scorching temperature for the treatment time employed. *  *  * "

\* \* \* \* \*

"It will be apparent from the above that the essential requirements of the invention as practiced by a friction member are that the desired degree of permanent compression be obtained in a short time and that the pressures, the speed of the friction member and the rate of work feed may be varied widely, if properly correlated to meet those requirements. However, as a guide in determining any desired proper combination of pressures, speeds and feeds in accordance with the above principles, it may be stated that excellent results on birch plywood have been obtained with the apparatus of the drawing under the following conditions:

"Diameter of drum 10 ........................ 16".
Work feed ............................... 90 ft. per minute.
Belt speed ............................... 4000 ft. per minute.
Force exerted by roller 15 .................. 7½# per lineal inch.

———◆———

"Under the above conditions the contact time is ⅟₁₈ of a second or less for a contact band of one inch or less and the temperature closely approaches the scorching temperature which is believed to be in the neighborhood of 620° F. for that treatment time. This is indicated by the fact that under the conditions stated a very slight indication of scorching is noted at rare intervals. This can be avoided, if desired, and excellent results achieved by increasing the feed rate to 125 feet per minute." United States Patent No. 2,827,935.

Prior to the issuance of Alexander's patent, General Plywood announced its new process and put the products on the market. It also began actively seeking to interest licensees in its process and succeeded in doing so. As a result, through advertising, through stores, in the Wall Street Journal, and through demonstrations of the process to prospective licensees, General Plywood revealed the process in some or all of its relevant aspects to many potential licensees—and/or competitors. Among these was the giant of the industry, U. S. Plywood.

It is clear that from the beginning U. S. Plywood regarded General Plywood's "Microsealing" as new and as competitively important. Its president, S. W. Antoville, ordered U. S. Plywood's Louisville agent to purchase and forward a microsealed door for U. S. Plywood's examination and tests. He also ordered one of their salesmen to visit General Plywood's Louisville plant and learn what he could about the process.

General Plywood's reaction appears to us to have been an eager welcoming of U. S. Plywood's interest. At the first visit of the U. S. Plywood's salesman, General Plywood's president, Henry M. Reed, told him that he would like to talk to Antoville. Reed wrote Antoville on October 15, 1956 (just after Alexander filed his patent application):

"Our investigations lead us to believe we will obtain strong patents, otherwise, we would not bother to spend the money to attempt to obtain them.

"To me it is a one way street. We license companies. If we should not obtain a patent, then our licensees are already 'in business' with the process and have all the techniques and 'know how.' They discontinue paying royalties on the process and we are 'out of luck.' "

There is no doubt at all that U. S. Plywood commenced its investigation of the Microseal process with a view toward finding a way to match its results, or, as a reluctant alternative, negotiation of a licensing agreement. Unfortunately

for General Plywood, U. S. Plywood found a method fairly readily at hand.

Acting on 3M advice, it found that it could employ a fine sanding operation which was already being used in the industry for finish polishing to achieve on wood in the white plywood panels results at least quite similar to those produced by the microsealing. U. S. Plywood thereupon notified General Plywood that it was not interested in taking a microsealing license and proceeded with the fine sanding procedure outlined above, which it named "Micro-Fine."

Subsequently, when its patent had been issued, General Plywood served U. S. Plywood with written notice of infringement. U. S. Plywood responded with a suit attacking the validity of General Plywood's patent and seeking a declaratory judgment of noninfringement and of patent misuse. Thereupon General Plywood, by counterclaim asserted validity of its patent, alleged infringement and breach of trust by U. S. Plywood and claimed damages.

This then brings us to the two major issues of validity and infringement. The District Judge found the patent valid but not infringed.

■ Alexander's patent was issued upon a process or a method. The machine he employed was built and patented by others. The cork belt he employed was patented by 3M. But in the view of the District Judge (and in ours) there was novelty and utility sufficient to warrant a finding of invention in Alexander's method of applying these two to the treatment of wood in the white. As the District Judge noted, a process or method may be the subject of a patent. Patent Act of 1952, 66 Stat. 797, 35 U.S.C. § 101 (1964 ed.);[1] Cochrane v. Deener, 94 U.S. 780, 24 L.Ed. 139 (1876).

These novel features of the Alexander process may be noted:

1) The cork belt, though previously used for polishing wood, had never been employed for treating plywood panels in the wood in the white stage.

2) The employment of a resilient roll for a panelwide cork belt on a Timesaver machine achieved a uniformity of treatment not successfully achieved before.

3) The employment of relatively high speeds and pressures correlated to achieve the impact of heat just below scorching helped to achieve a surface smoothness, density and gloss in one machine operation which made subsequent finishing operations substantially simpler and less expensive.

In Cochrane v. Deener, supra, the Supreme Court said:

"A process is a mode of treatment of certain materials to produce a given result. It is an act, or a series of acts, performed upon the subject matter to be transformed and reduced to a different state or thing. If new and useful, it is just as patentable as is a piece of machinery. In the language of the patent law, it is an art. The machinery pointed out as suitable to perform the process may or may not be new or patentable; whilst the process itself may be altogether new, and produce an entirely new result. The process requires that certain things should be done with certain substances, and in a certain order; but the tools to be used in doing this may be of secondary consequence." Cochrane v. Deener, supra, at 788.

The Alexander process was both new in the industry and of great commercial value. While prior-art (including the Judd patent) taught something about each of the cited features, no prior-art taught the application of all of these features in the combination indicated at the

---

2. "§ 101. *Inventions patentable.* Whoever invents or discovers any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof, may obtain a patent therefor, subject to the conditions and requirements of this title." 35 U.S.C. § 101 (1964 ed.).

point in the plywood manufacturing process taught by Alexander's patent.

Nor do we think that Alexander's process was an obvious development to any mechanic skilled in the art. The problems solved had existed for years in the industry and had resisted the efforts of others skilled in the art.

■■ We believe the record supports the District Judge's finding that the Alexander patent is valid. The District Judge in upholding validity relied strongly upon the statutory presumpton of validity accorded to a patent, like Alexander's, which was regularly issued by the United States Patent Office. Patent Act of 1952, 35 U.S.C. § 282 (1964 ed.). Without disregarding the force of this presumption, we feel it important to note also that our review indicates to us that Alexander's patent meets the statutory tests of utility, novelty, and nonobviousness (Patent Act of 1952, 35 U.S.C. §§ 101, 102, 103 (1964 ed.); United States v. Adams, 383 U.S. 39, 86 S.Ct. 708, 15 L.Ed.2d 572 (1966)). We likewise feel that Alexander's patent meets the Constitutional standard of invention (U.S.Const. art. I, § 8, cl. 8).[3] That standard has been described as including "Innovation, advancement, and things which add to the sum of useful knowledge * * *." Graham v. John Deere Co., 383 U.S. 1, 6, 86 S.Ct. 684, 688, 15 L.Ed.2d 545 (1966).

■ While, as we will point out, the District Judge ultimately found noninfringement of this patent, we feel he was correct in passing squarely on its validity. The issues raised by cross-filed pleadings are complex. Validity is squarely attacked by the original plaintiff. And the case has involved a lengthy trial of complex facts, most of them bearing directly upon this issue. We believe ample precedent supports his passing on validity in the decree. Sinclair & Carroll Co. v. Interchemical Corp., 325 U.S. 327, 65 S.Ct. 1143, 89 L.Ed. 1644 (1945);

Altvater v. Freeman, 319 U.S. 359, 63 S.Ct. 1115, 87 L.Ed. 1450 (1943); Sparton Corp. v. Evans Products Co., 293 F. 2d 699 (C.A. 6, 1961), cert. denied, 368 U.S. 967, 82 S.Ct. 439, 7 L.Ed.2d 395 (1962). This controversy has no resemblance to a fictitious suit designed to achieve an advisory opinion. Cf. Cover v. Schwartz, 133 F.2d 541 (C.A. 2, 1943), cert. denied, 319 U.S. 748, 63 S.Ct. 1158, 87 L.Ed. 1703 (1943).

The District Judge's finding on the infringement question was: "(3) Said Alexander patent has not been infringed by the plaintiff, United States Plywood Corporation; * * *"

His reasoning follows:

"To the Court, the Alexander patent clearly contemplates the use of buffing belts that are non-abrasive or relatively non-abrasive and of nonmetallic material. In fact, Alexander expresses a preference for the use of 'a surface treating belt of the type having a cork surface' in his description of the process in his patent. I think this distinction is much more clearly set forth in the Alexander patent than in the Judd patent.

"The Court has determined that all of the evidence from which infringement by USP could be inferred involves its use of 8/0, 9/0 and 10/0 abrasives or sandpaper in treating wood surfaces. There is no proof that USP was using cork or nonmetallic abrasives in any of the accused operations; hence, there is no foundation upon which an infringement could be based.

"Counsel for GPC said in his opening statement and repeated several times during the presentation of the case that if USP was sanding in its accused operations then there was no infringement. Since, to the Court, a reading of Alexander's description of his process and the claims of his patent contemplated the use of belts that

3. The federal patent power stems from a Constitutional provision which authorizes Congress "To promote the Progress of * * * useful Arts, by securing for limited Times to * * * Inventors the exclusive Right to their * * * Discoveries." U.S.Const. art. I, § 8, cl. 8.

are originally designed as unabrasive or relatively non-abrasive, it would be illogical to conclude that his patent could be infringed by a belt designed and manufactured as an abrasive instrument but which became relatively non-abrasive because it was worn by use. This was referred to on several occasions during the progress of the trial and none of the witnesses for GPC were ever able to give the Court a satisfactory formula by which it could be told when an 8/0, 9/0, or 10/0 belt ceased to be abrasive and became an infringer of the process in the Alexander patent."

We affirm this finding also.

General Plywood described its treating belt as "non-abrasive" or "relatively non-abrasive," "non-metallic," "flexible," and "yielding." None of these descriptive terms are appropriate to describe the 10/0 aluminum oxide grit sandpapers which United States Plywood employed.

We do not ignore General Plywood's argument that U. S. Plywood's results were really achieved by either the crushing of the grit on the "modified" belts, or the use of worn belts, or by the rapid filling of the belts with wood particles so as to terminate any substantial abrasive action. We have, however, noted in the record testimony which certainly constitutes substantial evidence that the 10/0 sanding employed by U. S. Plywood did remove significant amounts of stock. Observers testified to visible dust and the necessity of dust collectors on the "Micro-Fine" process where General Plywood contends such were not necessary in microsealing.

■ Infringement is generally a question of fact for the trial court. On review this court does not reverse a finding of noninfringement unless we can say it is "clearly erroneous." Rule 52(a) Fed.R.Civ.P.; Toledo Scale Corp. v. Westinghouse Electric Corp., 351 F.2d 173 (C.A. 6, 1965); Maytag v. Murray Corp. of America, 318 F.2d 79, 82 (C.A. 6, 1963).

We do not think that this record allows us to say that the District Judge's finding of noninfringement was "clearly erroneous." The trial judge heard extensive testimony for 40 trial days. Much of the evidence on infringement was conflicting. We think the view he took of the evidence was at least a "permissible" one and hence not clearly erroneous. United States v. Yellow Cab Co., 338 U.S. 338, 342, 70 S.Ct. 177, 94 L.Ed. 150 (1949).

Over and above what we have already said on the issue of infringement and at least somewhat persuasive to us is the fact that the record appears to demonstrate that what U. S. Plywood did was essentially to move a fine sanding operation which was already being used in the industry for finish polishing to an earlier point in the production process and apply it to wood in the white panels. If Alexander's patent should be broadly enough construed so as to apply to this operation, then it would be hard to ascribe to it the novelty, as opposed to prior-art, which is required for invention.

■ The District Judge found that General Plywood was not guilty of misuse of its patent. We agree. This record provides no indication that the patent in suit is being employed for leverage to sell either other patents or other unpatented goods and services. Morton Salt Co. v. G. S. Suppiger Co., 314 U.S. 488, 62 S.Ct. 402, 86 L.Ed. 363 (1942); Rocform Corp. v. Acitelli-Standard Concrete Wall, Inc., 367 F.2d 678 (C.A. 6, 1966).

U. S. Plywood alleges that the product "tied-in" was a resin sold by Reichhold Chemical, Inc. But no microseal licensee was required to purchase this resin; nor was any company refused a license under the Alexander patent because of failure to purchase this resin.

■ The District Judge also found that U. S. Plywood had not been guilty of breach of trust.

The fundamentals required for such an action, as stated in Restatement of the Law, Torts, § 757, are:

"§ 757. *Liability for Disclosure or Use of Another's Trade Secret—General Principle.*

"One who discloses or uses another's trade secret without a privilege to do so, is liable to the other if

"(a) he discovered the secret by improper means, or

"(b) his disclosure or use constitutes a breach of confidence reposed in him by the other in disclosing the secret to him, or

"(c) he learned the secret from a third person with notice of the facts that it was a secret and that the third person discovered it by improper means or that the third person's disclosure of it was otherwise a breach of his duty to the other, or

"(d) he learned the secret with notice of the facts that it was a secret and that its disclosure was made to him by mistake."

What we have already said on the issue of infringement argues strongly for affirmance on this issue likewise. This record supports the District Judge's view that U. S. Plywood did not employ the process which General Plywood disclosed.

Additionally, we note that this record does not support a finding of breach of a confidential disclosure. This record discloses no effort at maintaining secrecy of the process in General Plywood's plant. Its employees were not even warned against disclosure. It is also apparent to us, as it was to the District Judge, that General Plywood actively sought licensing agreements with many firms in the plywood industry, including U. S. Plywood. In this process it necessarily made a variety of disclosures. In doing so it appears to us, as it did to the District Judge, that it neither made any effort at maintaining secrecy of its process nor at securing an agreement for confidentiality. Hamilton Mfg. Co. v. Tubbs Mfg. Co., 216 F. 401 (W.D.Mich. 1908).

U. S. Plywood clearly sought to learn all it could about General Plywood's process. But General Plywood's revelations were the eager revelations of a prospective licensor to a prospective licensee. General Plywood asked for no agreement of confidentiality from U. S. Plywood—and received none. Having chosen to rely solely upon its patent rights for protection, and having failed to keep its process secret prior to grant of the patent, General Plywood is not now in a position to sustain an action for breach of trust. Huszar v. Cincinnati Chemical Works, Inc., 172 F.2d 6 (C.A. 6, 1949).

At best this can only be described as a close and difficult case. The District Judge did not abuse his discretion in requiring each party to pay its own costs.

Affirmed.